337 So.2d 1114 (1976)
STATE of Louisiana
v.
James L. WELCH.
No. 57687.
Supreme Court of Louisiana.
September 13, 1976.
Rehearing Denied October 15, 1976.
*1115 James D. Sparks, Jr., Monroe, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., J. Carl Parkerson, Dist. Atty., John R. Harrison, Asst. Dist. Atty., for plaintiff-appellee.
DENNIS, Justice.
The crucial question in this case is whether the State failed to demonstrate satisfactorily the use of procedural safeguards in the interrogation of a mentally retarded, semi-literate defendant, as required by Article I, § 13 of the Louisiana Constitution of 1974 and the Fifth Amendment to the United States Constitution as applicable to the states under the Fourteenth Amendment and Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and thereby required the trial court to suppress any incriminating statement elicited by the police during the interrogation.
On August 28, 1975, two black youths committed an armed robbery at a convenience store in Monroe. Despite diligent investigation for almost a week police officers were unable to obtain evidence pointing to a suspect in the case. But on the afternoon of September 3, 1975, one of the officers received a telephone message from an informant that a certain juvenile had been involved in the crime. During an interview this juvenile implicated the defendant, James Welch.
*1116 At 8:00 a.m. the next morning the officers went to the house where defendant lived with his parents. They advised the defendant and his mother that he was a suspect in an armed robbery investigation. Upon the policemen's request, Mrs. Welch consented to a search of the house, during which they found no evidence related to the offense. The defendant then voluntarily accompanied the officers to the station for questioning. O'Neal Welch, the defendant's father, who had been called from his job by his wife, arrived at police headquarters about the same time as the officers and his son.
As a result of statements made by the defendant during interrogation at the police station he was charged with the crime of armed robbery. La.R.S. 14:64. Defense counsel moved to suppress these statements as having been unconstitutionally obtained, but the trial court overruled his motion. After trial, the jury found the defendant "[g]uilty as Charged with the Request of Liniecy [sic] due to Instability of the Defendant." The trial judge conducted a presentence investigation and sentenced defendant to fifteen years at hard labor.
Defendant filed an appeal based on ten assignments of error. We find merit in his first two assignments, in which he contends that the motion to suppress should have been granted and that his confession should not have been introduced at trial. Consequently, we must reverse his sentence and conviction, and remand the case to the district court for a new trial.
On the day of the interrogation the defendant, James Welch, was nineteen years old, but his intellectual capacity was well below that of a normal person his age. The record includes an "Intellectual Evaluation" prepared by a psychologist who administered four intelligence and achievement tests to defendant. The evaluation states:
"On the WAIS [Wechsler Adult Intelligence Scale], Mr. Welch obtained a Verbal IQ of 73, a Performance IQ of 82 and a Full Scale IQ of 76. This would place his level of current intellectual functioning within the borderline retardation range. A PPVT [Peabody Picture Vocabulary Test] IQ of 65 tends to substantiate the indications of the WAIS. The WRAT [Wide Range Achievement Test] indicates Mr. Welch's academic achievement in the area of reading, spelling and arithmetic to be similar to that of a second grader.
"The Bender Visual-Motor Gestalt Test suggests that Mr. Welch may have a neurological dysfunction within that area of the brain which controls visual-motor coordination. This may have contributed to his present level of intellectual functioning.
"Mr. Welch seems to be able to handle simple routine tasks adequately. As the task become more abstract and intellectual he probably encounters difficulty in coping with the task and understanding it. Various portions of the examination, particularly portions of the WAIS, indicated that he experiences difficulty changing from one thought to another quickly. He also tends to be easily distracted when performing intellectual tasks. * * *"
The police officers, of course, did not have knowledge of the test data contained in the evaluation, but they admitted to having been informed before the interrogation by the defendant and his father that James Welch "wasn't too smart" and was not "in complete control of his faculties." His deficiency of intellect and education were borne out during the motion to suppress hearing by his inability to read most of the pertinent language in the police waiver form, including the words "understand," "undersigned," and "remain silent."
The interrogation was conducted by the police officers in two sessions. During the first session, in which the defendant's father, O'Neal Welch, was present, the defendant initially refused to admit involvement in the crime. However, after being informed repeatedly by the officers that a confederate had confessed implicating him, after being shown that the alleged accomplice was present at police headquarters, and after the officers denied his father's request that he be allowed to confer with *1117 an attorney, the defendant finally blurted out "I done it," and proceeded to make other incriminating statements. The first interview session was then interrupted and the officers left to arrest another youth suspected of having participated in the armed robbery. Approximately one hour later the officers returned and during a second interrogation session, at which defendant's father was not present, they obtained from defendant a signed written waiver of his constitutional rights and a taped confession implicating him in the robbery. It is undisputed that no record was made of the first interrogation session or any conversation with the defendant other than that made during the second interrogation session.
According to the testimony of one of the police officers at the motion to suppress hearing, the defendant was "advised of his rights" at his home that morning, and at the police station before the first interrogation: "[h]e was again advised of his rightshe was advised that he was not under arrest at the present time, but that any incriminating statements which he might make could lead to his arrest. And he was advised of his rights." This officer stated that when they were almost through with the interview, and before the defendant had incriminated himself, the father advised them that he thought he should get his son an attorney. According to this officer the other policeman replied to the father that the defendant was of full age and should be allowed to decide what he wanted to do; and after this exchange the defendant said, "I done it."
The second officer involved in the case testified to substantially the same facts, except that he stated defendant's father, O'Neal Welch, "had objections aboutat that time [the beginning of the first interrogation] about him even talkingsomething about he wanted his son to have a lawyer." Furthermore, he testified that on two or perhaps three occasions during the interrogation the defendant's father interrupted and persistently asked that the interview be stopped to allow him to get an attorney for his son.
The defendant's father, O'Neal Welch, testified that he asked one of the interrogating officers for permission to get his son an attorney almost immediately upon arriving at the station. The officer, however, simply walked away without answering, according to the father. Later he was invited to come into the interrogation room with his son. When asked what happened after he entered the interrogation room, Mr. Welch testified:
"Q. What happened then?
"A. Detective Brown advised him [the defendant] he had a right not to talk if he didn't want to. The other rights, I can't recall them, but he didn't offer him the right to have a lawyer.

"Q. He did what?
"A. Didn't offer him the right to a lawyer.

"Q. Didn't say anything about an attorney?

"A. No sir, no." (Emphasis added).
Mr. Welch further testified that pressure tactics were used on his son by the officers such as hollering at him, promising to reduce the charge below armed robbery, telling him a "boy" who cooperated in another case got two years, whereas one who didn't got fifteen years, and threatening the defendant that if he didn't cooperate "I will go all out to get you" and "to put all this rap on you, let you carry it by yourself." The father testified that he asked about six times or more to be allowed to get a lawyer for his son but was refused each time. He further testified that the manner and demeanor of the officers frightened both him and the defendant who started shaking. After this Mr. Welch testified his son started confessing to the crime in compliance with the officers' demands.
James Welch, the defendant, testified he indicated to the police officers that he wanted an attorney by shaking his head when his father asked them to stop and let him employ one. He stated that he and his father started to get up and go, apparently to see an attorney, but the officers ignored *1118 their wishes and began to ask the defendant more questions. When asked if the defendant nodded his head, one officer replied "[n]o Sir, not to my knowledge, he did not." The other officer testified definitely that the defendant did not nod his head at this time. O'Neal Welch was not asked by either counsel whether his son nodded assent while the father requested assistance of counsel.
The defendant was never asked by either defense counsel or the prosecuting attorney whether the officers had explained to him before the first interrogation session his rights to an attorney or to stop the interview at any stage of the process. He did admit that he signed the waiver of rights form during the second interrogation session. But he stated he did not understand all of the form and that he gave his statements to the police because he was scared.
We find it very significant that in rebuttal the State called just one of the interrogating officers back to the stand, and that he was only asked to identify the tape recording of the defendant's statement made during the second interrogation session. The beginning portion of the tape was played containing the defendant's affirmative one word responses to somewhat elaborate questions asking whether he understood and waived his constitutional rights during the second interrogation session. The officer was not asked, however, whether it was true, as O'Neal Welch testified, that the defendant was not informed of his right to an attorney before the first interrogation session. Nor, was the officer asked whether his terse statement that the defendant had been "advised of his rights" at the Welch house meant that defendant was specifically told that he had the right to the assistance of an attorney.
Article I, § 13, Louisiana Constitution (1974) provides:
"When any person has been arrested or detained in connection with the investigation or commission of any offense, he shall be advised fully of the reason for his arrest or detention, his right to remain silent, his right against self incrimination, his right to the assistance of counsel and, if indigent, his right to court appointed counsel. In a criminal prosecution, an accused shall be informed of the nature and cause of the accusation against him. At each stage of the proceedings, every person is entitled to assistance of counsel of his choice, or appointed by the court if he is indigent and charged with an offense punishable by imprisonment. The legislature shall provide for a uniform system for securing and compensating qualified counsel for indigents."
Louisiana thereby incorporated in its constitution the right of an accused to be given the warnings required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). See State of Louisiana Constitutional Convention of 1973 Verbatim Transcripts, September 1-7, 1973, Vol. XIII pp. 68-112, Vol. XIV pp. 1-51; Hargrave, The Declaration of Rights of the Louisiana Constitution of 1974, 35 La.L.Rev. 1 (1974).
In Miranda, the United States Supreme Court briefly summarized its holding:
"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, *1119 knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." Miranda v. Arizona, 384 U.S. at 444-45, 86 S.Ct. at 1612, 16 L.Ed.2d at 906-07.
Furthermore, the high court held that the Fifth and Fourteenth Amendments place a "heavy burden" on the state to demonstrate compliance with these warnings:
"If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the Government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. * * * This Court has always set high standards of proof for the waiver of constitutional rights * * * and we re-assert these standards as applied to in-custody interrogation. Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders." Miranda v. Arizona, 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724 (citations omitted).
In his per curiam to the assignment of error dealing with the motion to suppress the trial judge, in part, stated:
"At the hearing on the motion, testimony revealed that the defendant was advised of his rights on at least three occasions prior to the taking of the statement in question. Although the defense was apparently attempting to contend that the accused did not have the mental ability to understand, his conduct in the courtroom clearly indicated the contrary. Taking special note of his conduct, the Court observed that he was able to understand questions of both attorneys and to respond intelligently.
"The defendant's father was invited by the officers into the interrogation room, where the defendant was questioned. Apparently on one or more occasions the father mentioned getting an attorney; however, his son never concurred in this or, at least, never indicated to the officers his concurrence. (The defendant did testify to, on one occasion in the hallway, shaking his head in concurrence toward his father. This gesture, however, was obscure and, if it occurred, was apparently not intended to be seen by the officers.) Later, after an oral statement was taken, there was a delay of nearly an hour before the recorded statement in question was taken. No effort was made by the father to get an attorney during this time and none was requested by the defendant."
In reaching these conclusions the trial court clearly did not place a "heavy burden" on the State to prove that the defendant knowingly and intelligently waived his right to retained or appointed counsel before the first interrogation session as required by both Miranda and our State constitution. The routine testimony by an officer that the accused was "advised of his rights" does not fulfill this requirement, particularly in the instant case where a third person who was present at a time the defendant was "advised of his rights" testified definitely, repeatedly and without contradiction that the defendant was not advised of his right to the assistance of counsel. Accordingly, the prosecution in this case should not have been allowed to use statements stemming from the first interrogation of the defendant.
Although it is unnecessary to reach the issue, the writer of this opinion also has doubt whether, under the circumstances, *1120 the refusal by the police to honor the request of the parent of a mentally retarded, semi-literate defendant to allow the defendant to confer with a lawyer during the course of the interrogation was in keeping with the requirements of Article I, § 13, Louisiana Constitution (1974) and Miranda. The mere fact that he was nineteen years of age did not entitle the policemen to treat this particular defendant as if he were an adult possessing intelligence and education comparable to their own. Interrogating officers are entitled to rely upon reasonable appearances of understanding and consent, but they should be mindful that the system of warnings and cautions required by Article I, § 13 and Miranda are designed to assure that the waiver of any constitutional right protected thereby is a voluntary, knowing and intelligent waiver. Therefore, since the officers in the instant case were aware of the diminished intellect of the defendant, and since his father was present, this writer considers that it would have been more reasonable for them to assume that the child-like defendant, who probably was accustomed to reliance upon his father's guidance, concurred in his father's request. Since the evidence indicates the defendant may not have been advised of his right to a lawyer and because his father's request was summarily denied, I do not think it reasonable for the officers to expect this particular defendant suddenly to become an articulate and forceful advocate for his own constitutional rights. Under the circumstances here, it is my view the officers should have honored the father's request for the assistance of counsel, or, at least, they should have taken the time to ask the defendant directly and carefully if he wanted to continue the interrogation without the assistance of a lawyer.
At the motion to suppress hearing, the State chose to ignore its failure to demonstrate clearly the lack of a voluntary, knowing and intelligent waiver of the right to counsel prior to the first interrogation session. Instead, it relied solely upon the signed waiver form and the tape recorded waiver obtained from defendant during the second interrogation session. However these waivers followed the first interrogation session during which the officers obtained an incriminating statement that we have found the prosecution should not have been allowed to use. The two interrogation sessions were separated only by one hour during which the defendant was placed in a jail cell isolated from his parents, friends and counsel.
When a defendant urges suppression of an inculpatory statement given subsequent to a prior inculpatory statement that is in inadmissible because it is not free and voluntary or because the Miranda directives were not followed in conducting interrogation leading to the initial confession, the proper inquiry is whether the conditions that rendered the earlier confession inadmissible carried over to invalidate the subsequent one. Darwin v. Connecticut, 391 U.S. 346, 88 S.Ct. 1488, 20 L.Ed.2d 630 (1968); Beecher v. Alabama, 389 U.S. 35, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967); Randall v. Estelle, 492 F.2d 118 (5th Cir. 1974). The intervening warning informing defendant of his right to the assistance of counsel, coming as it did after the first interrogation process, rather than at its beginning, and after a request for counsel and cessation of the first interrogation process by his father had been denied, could scarcely serve sufficiently efficacious purposes when only one hour had passed before defendant, alone and officially under arrest, was asked to repeat the incriminating statement to the same officers who had conducted the first interrogation. The second confession was simply not sufficiently removed from the preceding statement in time or circumstances to eliminate the taint created by the first unlawful oral confession.
Accordingly, we conclude the trial court fell into error in refusing to grant the motion to suppress defendant's taped inculpatory statement and in admitting it into evidence at trial.
For the reasons assigned, the ruling of the trial judge on the motion to suppress is reversed. Consequently, the conviction and sentence of the defendant are also set aside, *1121 and the case is remanded to the trial court for further proceedings, including a new trial, according to law and consistent with the views herein expressed.
SUMMERS and MARCUS, JJ., dissent.
SANDERS, C.J., dissents and assigns written reasons.
SANDERS, Chief Justice (dissenting).
The basic holding of the majority is set forth in the following language:
"[T]he trial court clearly did not place a `heavy burden' on the State to prove that the defendant knowingly and intelligently waived his right to retained or appointed counsel before the first interrogation session as required by both Miranda and our State constitution. The routine testimony by an officer that the accused was `advised of his rights' does not fulfill this requirement, particularly in the instant case where a third person who was present at a time the defendant was `advised of his rights' testified definitely, repeatedly and without contradiction that the defendant was not advised of his right to the assistance of counsel. Accordingly, the prosecution in this case should not have been allowed to use statements stemming from the first interrogation of the defendant."
I disagree with this holding, because, in my opinion, the record adequately establishes that the defendant was advised of his right to the assistance of counsel.
In the transcribed testimony designated for our consideration, Detective Warren Brown, one of the investigating officers, testified:
"Q. Okay. And, what did you do when you were in the Interrogation Room?
"A. I advised him of his rights when we. . . immediately after we got in the room, advised him.
"Q. Specific . . . I mean, what what manner did you advise him of his rights? Did you . . . from memory, or how . . . did you do it?
"A. Yes sir, from memory.
"Q. And, specifically, what did you advise him at that point?
"A. I advised him that he didn't have to talk with us, he didn't have to make a statement. I advised him that any statement that he made could be used against him in Court. I advised him that he had a right to counsel, and that if he couldn't afford counsel that the Court may appoint him one . . .
"Q. Did you . . .
"A. I further advised him that he was not under arrest at the present time, but that any incriminating statements that he might make could lead to his arrest.
"Q. Did he acknowledge those rights to you?
"A. Yes.
"Q. In what manner did he acknowledge the rights?
"A. After each one, I'd ask him did he understand, and he would indicate `yes'." [Tr. 165-166]
The other officer, Detective Don McClanahan, testified as follows:
"Q. What was done after you went back into the room and began your interrogation, what . . .
"A. Detective Brown advised the defendant of his rights prior to any questioning . . .
"Q. Specifically, what did he advise him, as well as you can recall?
"A. He advised that he did not have to make any statements with regards to this robbery, that any statement that he used could be used against him in a Court of law. He also advised him that he had the right to have an attorney present during questioning if he so desired and if he couldn't provide one for himself the Court would provide one for him, and the defendant acknowledged that he did understand his rights." [Tr. 176-177]
*1122 It is true, as the majority notes, that both officers used the expression "advised of his rights" but their testimony must be interpreted in the light of the actual enumeration of the rights explained.
The issue of "request of the parent," referred to but not reached by the majority, raises a substantial constitutional question under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
The defendant, a 19-year-old adult, at no time requested an attorney. Admittedly, he is of borderline intelligence, but the trial judge found:
"The defendant's performance in the courtroom convinced the Court that he was clearly able to understand his rights, as explained by the officers, and also the questions asked of him. Having, thus, repeatedly been advised of his rights and then voluntarily making a statement as to the commission of the offense, the defendant could not later suppress that statement." [Tr. 61]
See State v. Edwards, 257 La. 707, 243 So.2d 806 (1971); State v. Callihan, 257 La. 298, 242 So.2d 521 (1970); State v. Augustine, 252 La. 983, 215 So.2d 634 (1968).
As I understand the testimony, the officers invited defendant's father to be present during the interview. After being advised of his rights, the defendant waived legal assistance. Near the end of the interview, the father remarked that "he thought he should get his son a lawyer." Before the officers could ascertain whether or not the son concurred in this remark, the son announced, "I done it." Upon learning of his son's involvement in the armed robbery, the father became angry at him, stated that he didn't want to have anything else to do with him, and started to leave the room. The officers persuaded him to remain. The son then explained his commission of the crime in more detail. However, in a few minutes, the officers discontinued the interrogation without getting a recorded statement. The investigation was then recessed for about an hour. During this time, neither the father nor son secured a lawyer or expressed interest in securing one.
I am inclined to resolve the question in favor of the conviction. Prior to interrogation, the defendant waived his right to legal assistance. The father's remarks do not seem to be a request for a lawyer. They were not concurred in by the defendant. In any event, the defendant confessed before the officers had time to pursue the matter further. See, e.g., Mayzak v. U.S., 402 F.2d 152 (5th Cir. 1968); Lloyd v. State, 223 Tenn. 1, 440 S.W.2d 797 (1969); Combs v. Commonwealth, Ky., 438 S.W.2d 82 (1969); People v. Smith, 42 Ill.2d 479, 248 N.E.2d 68 (1969); State v. Woods, 182 Neb. 668, 156 N.W.2d 786 (1968).
For the reasons assigned, I respectfully dissent.
TATE, DIXON and DENNIS, Justices (concurring in the denial of a rehearing).
The majority opinion accurately describes the testimony and evidence introduced at the motion to suppress hearing. The dissenting opinion of Sanders, C.J., quotes testimony of police officers which was not given at the motion to suppress hearing but later at the trial on the merits. Therefore, the later trial testimony is not relevant to our determination upon appeal whether the trial judge ruled properly in denying the motion to suppress. Accordingly, the original opinion should be reaffirmed and the motion for a rehearing denied.
SANDERS, C.J., dissents from the denial of rehearing, pointing out that the testimony referred to was designated for our consideration. Moreover, on the admissibility of a confession all testimony relating to it is properly considered.
SUMMERS and MARCUS, JJ., are of the opinion a rehearing should be granted.