370 So.2d 533 (1979)
STATE of Louisiana
v.
Johnny Ray COLLINS.
No. 62399.
Supreme Court of Louisiana.
April 9, 1979.
*534 Charles E. McConnell, 24th Judicial District Indigent Defender Board, Springhill, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Henry N. Brown, Jr., Dist. Atty., for plaintiff-appellee.
DENNIS, Justice.[*]
The question of law presented by this appeal is whether Louisiana's 1976 capital punishment legislation authorizes the imposition of a death penalty for a crime committed before the effective date of the legislation. For the reasons hereinafter assigned we conclude that the death penalty may not be applied retroactively and that the capital sentence in the instant case must be set aside.
Defendant, Johnny Ray Collins, was convicted of having committed a first degree murder which occurred on August 11, 1976. On the date of the offense the first degree murder statute provided that whoever committed the offense must be punished by death. La.R.S. 14:30 (La.Acts 1975, No. 327 and La.Acts 1973, No. 109). However, the United States Supreme Court invalidated this mandatory death penalty in Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976). Consequently, at the time of the offense in the instant case life imprisonment at hard labor without benefit of parole, probation or suspension of sentence for forty years was the only constitutional punishment for first degree murder.[1] Twenty-one days later on October 1, 1976, statutes redefining the crime of first degree murder and enacting a permissive, and presumably constitutional, death penalty became effective. La.R.S. 14:30; La.C.Cr.P. arts. 905-905.9 (La.Acts 1976, Nos. 657 and 694).
In the instant case the district court conducted a sentencing hearing in accordance with the 1976 capital punishment legislation and, pursuant to the jury's recommendation, sentenced Collins to death. In his appeal defendant contends that the district court erred in imposing the 1976 death penalty for a crime which occurred before its enactment. The State argues that the 1976 legislation applies retroactively to the offense at bar and that the death penalty should be affirmed. In support of its argument the State cites Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977) in which the United States Supreme Court held that the retroactive application of a Florida death penalty was not an ex post facto violation of the federal constitution.
We conclude that the State's reliance on Dobbert is misplaced because our state law prohibits the retroactive application of the 1976 capital punishment legislation. Nowhere in the 1976 capital punishment legislation itself is there any provision which purports to apply the new laws retroactively to crimes which were committed before the legislation's effective date. Therefore, these acts are governed by the original legislative intention that criminal code provisions shall not apply to a crime committed before their effective date, La.R.S. 14-142,[2] and the legislature's express stipulation that no section of the Revised Statutes is retroactive unless expressly so stated. La.R.S. *535 1:2.[3] Complementarily, the law makers have provided that the repeal of a penal statute does not extinguish any penalty incurred under the former statute, unless the repealing act so provides, and such law shall be treated as still remaining in force for the purpose of sustaining a prosecution. La.R.S. 24:171; see, State v. Terrell, 352 So.2d 220 (La.1977); State v. Paciera, 290 So.2d 681, 687 (La.1974); State v. Kent, 262 La. 695, 264 So.2d 611 (1972); State v. Cryer, 262 La. 575, 263 So.2d 895 (1972); State v. Bowie, 221 La. 41, 58 So.2d 415 (1952).[4] Accordingly, two things are clear: the 1976 death penalty may not properly be interpreted to apply to crimes committed before October 1, 1976; and the prosecution herein may be sustained only upon the former first degree murder statute whose death penalty has been declared unconstitutional.
For reasons similar to those assigned recently by the California Supreme Court in People v. Teron, 23 Cal.3d 103, 151 Cal.Rptr. 633, 588 P.2d 773 (Cal.1979), the United States Supreme Court's decision in Dobbert v. Florida is inapposite to the present case. In Dobbert, a majority of the United States Supreme Court indicated that, for purposes of the ex post facto clause of the federal constitution, a Florida statute in some respects similar to the 1976 Louisiana legislation could be applied retroactively as an "ameliorative" or "procedural" enactment. However, the Supreme Court was not faced with the question presented in the instant case of whether, as a matter of state statutory and jurisprudential law, a penal measure should be interpreted to apply to offenses committed prior to the effective date of the legislation. In Dobbert, the Florida Supreme Court had previously concluded as a matter of state law that the new legislation could be applied retroactively to an antecedent offense.[5] Thus, the United States Supreme Court was concerned only with the constitutionality of Florida's retroactive application of its death penalty statute under the federal ex post facto clause. See, People v. Teron, supra, at 782. In the instant case we do not reach the ex post facto question under either the federal or our state constitutions because the Louisiana 1976 death penalty is not retrospective.
Although the death penalty in the instant case must be set aside, the defendant's conviction will be affirmed since our review has detected no reversible errors. The defendant's assignments of error relating to mental capacity to proceed and waiver of constitutional rights present serious issues for discussion.
Johnny Ray Collins is a black man who was twenty-four years old at the time of the offense. He is a lifelong resident of Haughton, Louisiana. He is mentally retarded, with estimates of his intelligence quotient ranging between 43 and 68. He attended school through the seventh grade but was not able to read and write. For most of his life he has worked as a log and pulpwood cutter, and has been able to support his common-law wife and two children. Collins was previously convicted of burglary and theft, and he served one sentence in the state penitentiary for burglary.
*536 On August 11, 1976, a thirteen year old girl was abducted, sexually assaulted and strangled to death near Haughton, Louisiana. When she did not return home from an errand to the grocery store as expected, the police were called and soon learned that she and the defendant had departed the store at about the same time. The officers found the defendant at a neighbor's house and noticed that he was not dressed in pink pants and flowered shirt as reported by persons present at the store earlier that day. When asked if he had worn different clothing earlier in the day, the defendant replied that he had changed from some green colored clothing. The officers immediately advised the defendant of his constitutional rights. With the owner's consent, the officers searched the neighbor's house and discovered a pair of pink pants and a flowered shirt with two buttons missing. The remaining buttons on the shirt matched two others which had been discovered at the location where the girl was believed to have been seized. The officers again advised the defendant of his constitutional rights and placed him under arrest. The defendant subsequently confessed to having killed the girl and led the police to her body in the woods several miles from the grocery store.
The defendant's mental incapacity to proceed was raised by the defense and, after the appointment of a sanity commission and a hearing, the district court committed him to a state mental institution, finding that he lacked the requisite mental capacity. Approximately eleven months later, after a second sanity hearing and a motion to suppress hearing, the district court determined that the defendant had achieved the mental capacity to proceed and that his inculpatory statement and confession were admissible.

Mental Capacity to Proceed
The defense contentions of mental incapacity to proceed are based essentially upon the evidence educed at the first sanity hearing.[6] The medical consensus of the first commission was that Collins is moderately mentally retarded, trainable but not educable, has an I.Q. of 43, and would be unable to understand the proceedings or assist in his own defense. However, after eleven months of medication and therapy the second sanity commission reported markedly different findings. Its doctors found Collins to be only mildly retarded with an I.Q. of 68, educable, and mentally capable of standing trial. The earlier findings were discounted by the second sanity commission as not being accurate findings of Collins' true mental capacity due to their having been made shortly after the crime, in a more hostile environment, when Collins was upset and less willing or motivated, and before he had been given any medication for his anxiety.
During the second sanity hearing the court did not rely solely upon the conclusions of the mental capacity experts. Both the district attorney and the judge examined the witnesses closely with respect to considerations pertaining to the nature of the charge, the complexity of the case and the gravity of the decisions with which the defendant was faced, as required by State v. Bennett, 345 So.2d 1129 (La.1977), in which we stated:
"The decision as to a defendant's competency to stand trial should not turn solely upon whether he suffers from a mental disease or defect, but must be made with specific reference to the nature of the charge, the complexity of the case and the gravity of the decisions with which he is faced. See, Note, 6 Loyola Univ.L.J. at 684; Note, 4 Columb.Hum.Rights L.Rev. at 245; See also, United States v. Masthers, 176 U.S.App.D.C. 242, 539 F.2d 721 (1976). Appropriate considerations in determining whether the accused is fully aware of the nature of the proceedings include: whether he understands the nature of the charge and can appreciate its seriousness; whether he understands what defenses are available; whether he can distinguish a guilty plea *537 from a not guilty plea and understand the consequences of each; whether he has an awareness of his legal rights; and whether he understands the range of possible verdicts and the consequences of conviction. Facts to consider in determining an accused's ability to assist in his defense include: whether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial. See, State v. Augustine, [252 La. 983, 215 So.2d 634] supra; Robey, Criteria for Competency to Stand Trial: A Checklist for Psychiatrists, 122 Am.J. of Psychiatry, at 616; Note, 6 Loyola Univ.L.J. at 684-85; Note, 4 Columb.Hum. Rights L.Rev. at 245." 345 So.2d at 1138.
For instance, there was testimony for the two psychiatrists and a psychological assistant indicating that Collins was fully aware of the nature of the proceedings, the nature of the charge against him and its seriousness and the nature of the defenses available to him. The doctors' testimony contained specific details indicating that Collins understood his legal rights, was able to recall and relate facts pertaining to his actions and whereabouts on the day of the crime, and that he maintained a consistent account which tended to exculpate him from the offense: Collins reported to the doctors that he had been in the store on the day in question, that he had seen other persons pick up the girl after she left the grocery store, that he had confessed to the crime only out of fear of being lynched, and that he was able to lead the police to her body only because of something he overheard from another person near the investigation site and because of his knowledge of the woods. According to the sanity hearing evidence Collins was able to identify a witness who could corroborate some of the details of his defense and report this information to his attorney. The doctors further testified that Collins would be able to make the decisions necessary to assist in his defense, to testify in his own defense, and that if properly medicated his mental condition would not be apt to deteriorate under the stress of trial.[7]
A trial judge's determination of a defendant's capacity to stand trial is entitled to great weight especially where the evaluation of credibility or the resolution of conflicting medical testimony is concerned. State v. Morris, 340 So.2d 195 (La.1976); State v. Flores, 315 So.2d 772 (La.1975). After carefully considering the evidence produced at the sanity hearings, we conclude that the trial judge did not abuse his discretion in determining that defendant was capable of standing trial and assisting in his defense.

Waiver of Rights
Defendant assigns as error the trial court's refusal to exclude his several incriminatory statements and other evidence derived therefrom.[8] Collins' admission to having visited the store near the time of the victim's disappearance, and his attempt to conceal the clothing he had worn, led to further questioning which produced, first the incriminatory clothing and defendant's statement that he had loaned them to a friend; next, defendant's statement that he had seen two "boys" with an automobile pick up the victim near the store; and, ultimately, his confessions to the crime and disclosure of the location of the girl's body.
*538 Defendant contends that the trial court should have suppressed all these statements and evidence because (1) the defendant was not advised timely of his rights, and (2) the defendant was mentally incapable of knowingly and intelligently waiving his rights.
There is ample evidence of record from which the trial judge could reasonably conclude that the defendant was informed of his constitutional rights immediately after he told the officers he had been to the store earlier that day in green clothing. The evidence shows that he was advised of his rights on several subsequent occasions during the investigation. The question raised by defendant's first contention is, however, whether the officers had actually begun custodial interrogation before the initial warning was given the defendant.
The issue is a close one. La.Const.1974, Art. I, § 13, provides that when any person has been arrested or detained he must be advised fully of his rights. Defendant contends that the law officers' initial questions as to defendant's earlier whereabouts and apparel amounted to interrogation of a detained or arrested suspect without informing him of his rights. Although the evidence is susceptible to other interpretation, we ultimately conclude that the trial judge did not err in finding that the officers' actions under the circumstances placed insufficient restraints on the defendant's freedom to constitute either an arrest or a detention. The defendant was standing outside his friend's house when he was approached by the officers. He was not threatened with any physical restraint. The officers' preliminary questions as to his previous whereabouts and apparel did not necessarily indicate that the defendant was under suspicion or that he would be prevented from leaving. The officers were in the process of gathering information from all persons who were in the vicinity at the time of the young girl's disappearance. Under the circumstances, the officers were entitled to learn if in fact the defendant was the person in pink flowered apparel who was at the store at the time in question, as a means of identifying him as a person who should be interviewed, before inquiring into his knowledge of facts concerning the girl's disappearance. When the defendant confirmed that he was present during the time under investigation, but gave information controverting that of other witnesses as to the description of his clothing, the officers immediately advised him of his constitutional rights. Even though it is not free from doubt, the evidence supports the trial judge's conclusion that the defendant was not under suspicion or detention until he claimed to have worn green clothing to the store. Accordingly, defendant was not subjected to custodial interrogation without being informed of his constitutional rights.
The substantial evidence of defendant's mental retardation and incapacity raises a serious question also as to whether defendant could have knowingly and intelligently waived his rights. Without repeating our earlier summary of the mental capacity evidence it is evident that the defendant is not psychotic but probably is mildly retarded with an intelligence quotient of about 68. Nevertheless, the two psychiatrists who testified at the second sanity hearing were of the opinion that if the constitutional liberties were explained carefully to the defendant he could understand them. Defendant's life experiences and level of social performance tended to support the conclusions of these witnesses. He earned a living and supported his wife and two children. He had been subjected to police interrogation before and knew its possible consequences from being a fugitive and serving a penitentiary sentence. The state presented evidence that the constitutional rights were explained to defendant extensively on several occasions during the investigation.
If an accused's statement is taken without the presence of an attorney under circumstances in which a warning is required, a heavy burden rests on the state to prove that the accused knowingly and intelligently waived his privilege against self incrimination and his right to retained or appointed counsel. Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 *539 L.Ed.2d 694 (1966); State in Interest of Dino, 359 So.2d 586 (La.1976); State v. Welch, 337 So.2d 1114 (La.1976). Although the decision of the trial judge is entitled to great weight, this reviewing court must examine the record to be certain that the state has fully borne its heavy burden of proof. State v. Simmons, 328 So.2d 149 (La.1976); State v. Carson, 336 So.2d 844 (La.1976). After considering the evidence carefully in this case, we cannot say that the trial judge abused his great discretion in concluding that the state presented requisite proof of a knowing and intelligent waiver of rights by the defendant.
These assignments are without reversible merit.
We have reviewed the other assignments of error which were briefed and argued by defense counsel and find that none of them presents reversible error.[9] Since this determination is governed by settled principles of law not requiring further elucidation the reasons therefor will be publicly recorded by an unpublished appendix to the opinion of the court in the instant case.
Accordingly, for the reasons assigned the defendant's conviction is affirmed, but the death penalty is set aside. The case is remanded to the trial court with instructions to resentence the defendant to life imprisonment with hard labor, and without eligibility for parole, probation, or suspension of sentence for a period of forty years.
JUDGMENT AFFIRMED; CASE REMANDED FOR RESENTENCING.
DIXON, J., dissents with reasons.
DIXON, Justice (dissenting).
I respectfully dissent.
If a judicial proceeding which finds a defendant to be mentally incompetent to assist counsel and understand the proceedings against him is to be given any weight, then we must find this retardate incapable of intelligently waiving his constitutional rights to counsel and to silence.
NOTES
[*] Chief Judge William A. Culpepper participated in this decision as Associate Justice Ad Hoc sitting in the place of Chief Justice Sanders, retired.
[1] In State v. Jenkins, 340 So.2d 157 (La.1976), this Court held that the appropriate sentence to be imposed upon a valid conviction for first degree murder is the most severe penalty established by the legislature for criminal homicide at the time of the offense which could be presumed to be constitutional in the light of Roberts v. Louisiana, supra. At the time of the offense in the instant case the "most severe" constitutional penalty was heavier than that permitted by Jenkins because of the amendment to the second degree murder statute. See, La.Acts 1975, No. 380.
[2] La. R.S. 14:142 provides:

"This Code shall not apply to any crimes committed before July 29, 1942. Crimes committed before that time shall be governed by the law existing at the time the crime was committed."
[3] La. R.S. 1:2 provides:

"No section of the Revised Statutes is retroactive unless it is expressly so stated."
[4] By similar legislative enactment and judicial decisions, this is the general rule in other modern American jurisdictions. Bradley v. United States, 410 U.S. 605, 93 S.Ct. 1151, 35 L.Ed.2d 528 (1973). For a discussion of modifications of the general rule, See, Comment, Today's Law and Yesterday's Crime: Retroactive Application of Ameliorative Criminal Legislation, 121 U.Pa.L.Rev. 120, 127-28 (1972).
[5] Prior to trial, Dobbert had applied to the Supreme Court of Florida for a constitutional stay of trial alleging the application of an ex post facto law and a violation of equal protection. This application was denied. See, Dobbert v. Florida, 432 U.S. 282, 286-87, 97 S.Ct. 2290, 2295, 53 L.Ed.2d 344, 352 (1977). On appeal of his conviction, the Florida Supreme Court affirmed the conviction and death sentence without discussing the ex post facto argument. Dobbert v. State, 328 So.2d 433 (Fla.1976). Shortly after the decision in Dobbert was rendered by the Florida Supreme Court, that court reduced a death sentence to life imprisonment based on ex post facto principles and equal protection requirements. The state court's opinion in Dobbert was not mentioned. Lee v. State, 340 So.2d 474 (Fla.1976). See also, Note, 1978 Brigham Young U.L.Rev. 484, 489 (1978).
[6] By assignment of error number one, defendant contends that the trial court erred in ruling that defendant was able to stand trial and assist counsel in his defense.
[7] One psychiatrist who had cared for defendant at the forensic unit testified that since medication was given for anxiety and not for any psychosis, he believed that even if defendant's medication was stopped defendant would maintain his capacity.
[8] Assignment of error numbers three, six, seven and nine.
[9] Assignment of error numbers two, four, five, eight, thirteen, fifteen and sixteen.