408 So.2d 1114 (1982)
STATE of Louisiana
v.
Kem C. WEST.
No. 81-KA-0675.
Supreme Court of Louisiana.
January 8, 1982.
*1115 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., William E. Tilley, Dist. Atty., Edwin L. Cabra, Asst. Dist. Atty., for plaintiff-appellee.
Elvin C. Fontenot, Jr., of Indigent Defender Office, Leesville, C. Allen Bradley, Jr., & David L. Wallace, of Evans, Bradley & Wallace, DeRidder, for defendant-appellant.
DIXON, Chief Justice.[*]
Defendant, Kem West, appeals his conviction of second degree murder. He was sentenced to life imprisonment without benefit of parole, probation or suspension of sentence. Defendant's motion for a new *1116 trial was denied on January 5, 1981. Defendant's conviction is reversed, and a new trial is ordered.
On September 30, 1979 Detective Larry Smith of the Vernon Parish Sheriff's Office learned that a body had been found at the Harvy Crossing on Anacoco Creek in Vernon Parish.[1] Upon arriving at the scene, Detective Smith discovered the body later identified as William Calcote. He had been stabbed several times, and his throat had been cut.
Calcote's father related that the victim was last seen in DeRidder with Kem West and David Hart, a close friend of the victim. David Hart was picked up for questioning on October 1, 1979. He gave one statement disclaiming any involvement, and a second statement detailing his involvement in the incident. He implicated Kem West as the perpetrator of the crime.
Hart said he, West and a third person had beaten Calcote because he had put water in the oil of Hart's car. Hart stated the defendant tied up the victim and marked an X on his face with a knife that belonged to Hart. These events occurred at West's residence.
Calcote, West, Hart and a juvenile girl drove to the Harvy Crossing on the Anacoco Creek. Hart alleged West pulled Calcote out of the car and dragged him into some bushes. Calcote asked West not to kill him, and West told him "it wouldn't hurt but a little bit." West was gone for about ten minutes. He returned with blood on his hands, and the knife was bloody and bent. Hart maintains he remained in the car with the female juvenile during the murder.
Assignments of Error Nos. 1 and 2
Defendant contends that the trial court erred in denying his motion to suppress written statements made by him on October 1 and 4, 1979.
The defendant was arrested at his residence on October 1, 1979. He was taken to the Beauregard Parish Sheriff's Office and charged with the murder of William Calcote. James McCarty, an investigator for the Beauregard District Attorney's Office, testified that he informed West of his Miranda rights, and West signed a form that indicated he understood his rights. West refused to execute the lower part of the form that pertained to a waiver of his constitutional rights. He was transferred to the criminal office at the Beauregard Parish jail. He waited for forty-five minutes while representatives of the crime lab were en route to DeRidder to search West's house.
McCarty stated he entered the office to inform the defendant of the reason for the delay, and he offered West some coke or coffee. West asked him if there was someone he could talk to about the matter. McCarty volunteered to listen. West questioned him as to the time of Calcote's death and other questions along that line. McCarty took notes as West spoke. He asked West if he would provide the information in a written statement. West refused to do so until he spoke with his attorney. Defendant's counsel was notified, and West conferred with him prior to reducing the oral statement to writing.
Defendant submits his right against self-incrimination was violated. He asserts he was "encouraged" to make an oral statement after he had refused to surrender his constitutional right to remain silent.
The determining factor as to the admissibility of the statement is whether it was given freely and voluntarily and not the result of threats, coercion or promises. State v. Jennings, 367 So.2d 357 (La.1979); State v. Williams, 366 So.2d 1365 (La.1978). The state must show the defendant was advised of his Miranda rights and there was a valid waiver of those rights. State v. Knapp, 378 So.2d 911 (La.1979). The voluntary nature of the statement must be proved beyond a reasonable doubt. State v. Volk, 369 So.2d 128 (La.1979); State v. Jennings, supra.
*1117 Defendant had been advised of his Miranda rights. He indicated that he understood what those rights were. Failure to sign the waiver provision in and of itself does not require suppression of defendant's statement. State v. Turnbull, 377 So.2d 72 (La.1979). Defendant initiated conversation with and volunteered statements to McCarty. He was allowed to confer with counsel when he requested. He provided the written statement after the consultation. The evidence shows defendant understood his rights and freely and voluntarily waived them when he made the statement on October 1. The trial court committed no error in admitting this statement.
Statements obtained from the defendant on October 3 and 4, 1979 present serious problems regarding West's right to counsel. Two statements are involveda taped statement given to Vernon Parish Deputies Horton and Smith, and a written statement given shortly afterward to Beauregard Officers Bartlett and McCarty. The taped statement was suppressed by the trial judge. We find that the written statement is afflicted with the same infirmities as the earlier taped statement, and is a product of the earlier one.
West had been advised by his attorney on October 1 to make no statements to the police. Vernon Parish Deputy Horton and Detective Smith knew this fact. However, they obtained a statement from West after he learned that his mother had been arrested in connection with the murder. Deputy Horton stated West was taken from his cell on October 3 to obtain a blood sample. Horton claimed West wanted to give a statement to him and Smith without his lawyer present. He testified West first talked to his lawyer, but later said he only saw West use the phone.
Detective Smith testified West sent word that he wanted to talk to him and Horton about his mother. Smith said when he first saw West in Horton's office, West asked about his mother, and Horton told him she had been arrested. Smith contradicted Horton's testimony that West had been brought down for a blood sample. He testified West had given a blood sample on October 2, 1979; a dated vial of blood was introduced to corroborate this fact.
Smith testified that he knew West had an attorney and had been instructed to give no statements. He stated that he and Horton learned of Mrs. West's arrest minutes before the tape started, and West knew of her arrest before he and Horton met with him. They talked about West's mother's arrest prior to the tape. How West learned of his mother's arrest or Hart's statement is the subject of conflicting testimony. On Smith's cross-examination it was pointed out that West was in the Vernon Parish jail, and Hart was in the DeRidder city jail. Mrs. West was arrested by the Beauregard Sheriff's Office. There was no way for them to communicate except through the officers. Smith stated he reminded West that his attorney had advised him against making statements prior to the taped statement. West acknowledged the conversation with his attorney, but he wanted to tell them what he knew, and that his mother had nothing to do with the murder.
West testified that he was locked in the drunk tank on October 3, 1979 when Vernon Deputy Sheriff Horton came to his cell, and said he wanted a statement. Horton told West he had statements from everyone else, and they were pointing the finger at him and his mother. Horton told West he could maybe work something out for his mother if he gave a statement. This was the first time West learned of his mother's arrest.
West said Horton left the cell and returned with Smith to retrieve West. Horton told West he could help out his mother so that she wouldn't be charged with Murder I. He said a word from him would help out. The three of them went downstairs into a detective room at the Vernon Parish jail. West signed the waiver of rights form. He talked with Horton for fifteen to twenty minutes while Smith left to buy cassette tapes. (Smith denied ever leaving the room to buy tapes). Horton again told West that a statement would help his mother, but he would have to give one to the DeRidder police also. The reasons for the *1118 DeRidder statement were that West and his mother were arrested there, and the murder took place there.
West further testified Horton told him that Hart had said West killed Calcote, and Mrs. West had reason for wanting him dead. On tape West told Horton this was a lie. The tape also revealed that West told Horton he would confess to murder or anything to help his mother. West testified that he would not have given a statement if he had not been told it would help his mother. West stated he did not talk to his attorney on October 2 or 3. He had been advised not to make any statements on October 1, and he told Vernon Parish officials the same.
Horton denied ever going to West's cell and informing West about his mother or Hart's statements. Horton stated Smith advised him that West was in the office and was ready to give a statement. However, the tape tends to corroborate West's testimony:
Horton: "... is it true that you want to sit down and give us a statement without your lawyer present?
West: "Yes sir, if it's true what you told me David Hart said in his statement ..."
The tape also revealed the following:
Horton: "Well, the Beauregard Sheriff's Dept., Mr. Joe Bartlett, who is Chief Deputy of the Beauregard Sheriff's Dept. there, he called this afternoon just minutes before I came up and advised you that your mother was charged ..."
Horton admitted Deputy Bartlett called him prior to seeing the defendant and told him about West's mother.
Combined with West's testimony and the inconsistencies of Horton's and Smith's testimony, the taped statement makes it fairly sure that Horton went to West's cell and informed him of Hart's statement and West's mother's arrest. The trial judge believed this to be the case, and we agree.
If it is true that Horton made promises to West concerning his mother, the Beauregard officials apparently did not know this. West testified he only spoke with them because he had been told to do so by Horton. He testified the Beauregard officials made no promises to him about his mother, but he remembered Horton saying he would have to give a statement to the DeRidder (Beauregard) police if he wanted Horton to help his mother.
Beauregard Deputy Bartlett, Investigator McCarty and West testified they met in the Vernon Parish Sheriff's Office. Bartlett said he had been called by the Vernon office. West signed a rights waiver form after being advised of his rights. He never asked to have his attorney present or to cease the interview. No promises or threats were made to West. The testimony is consistent that it took two hours for West to give the statement and another one and a half to two hours to type it. Bartlett and McCarty talked to West about his mother prior to the statement. West asked whether he could help his mother, but they told him there were no deals, and they only wanted to talk about him. West maintained that he only signed the waiver of his rights because of Horton's story about his mother.
The police initiated conversation with and requested statements from West on October 3 and 4. The statements were obtained from him without benefit of counsel. This violated the Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) standard of police conduct that prohibits police inquiry once the defendant has "... expressed his desire to deal with the police only through counsel." 101 S.Ct. at 1885. Although rendered after defendant's trial and conviction, the Edwards rule is applicable to the statements obtained from Kem West. Edwards does not create a new mandate for police conduct, but delineates the requirements for a valid waiver of Fifth Amendment rights enunciated in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). "Edwards represents a line of cases which have clarified both the procedures necessary to implement the guarantees of the Fifth Amendment and the standards for waiving those protections." Costantino, Cannavo and Goldstein, *1119 185 N.Y.L.J. 117 (June 18, 1981). See Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1946); Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972); North Carolina v. Butler, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). This court has previously held statements inadmissible because they were given after the police initiated conversation with the defendant, while they were aware of defense counsel's instructions to the contrary. See State v. Jackson, 303 So.2d 734 (La.1974); State v. Weedon, 342 So.2d 642 (La.1977); State v. Thucos, 390 So.2d 1281 (La.1980).
The defendant in Edwards had been arrested for robbery, burglary and first degree murder and was brought to the police station. He denied his involvement in the crimes and gave an alibi in the form of a taped statement. Edwards said he wanted to make a deal, but the officer said he did not have authority to do so. Defendant was given the phone number of an attorney, but he hung up a few moments after he placed the call. Edwards said he wanted an attorney before making a deal, so the questioning ceased, and he was returned to his jail cell.
The next morning two detectives went to the jail. The guard told the defendant the detectives wished to speak with him, but Edwards said he didn't want to talk to anyone. The guard told him he had to talk to them. Edwards was taken to the detectives, and they advised him of his Miranda rights. The defendant wanted to hear the taped statement of his accomplice, so it was played for him. He then gave a statement with the stipulation that it not be tape recorded.
The United States Supreme Court held:
"... that waivers of counsel must not only be voluntary, but constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case `upon the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused.' Johnson v. Zerbst, 304 U.S. 458, 464 [58 S.Ct. 1019, 1023, 82 L.Ed. 1461] (1938). See Faretta v. California, 422 U.S. 806, 835 [95 S.Ct. 2525, 2541, 45 L.Ed.2d 562] (1975); North Carolina v. Butler, 441 U.S. 369, 374-375 [99 S.Ct. 1755, 1758, 60 L.Ed.2d 286] (1979); Brewer v. Williams, 430 U.S. 387, 404 [97 S.Ct. 1232, 1242, 51 L.Ed.2d 424] (1977); Fare v. Michael C., 442 U.S. 707, 724-725 [99 S.Ct. 2560, 2571-2572, 61 L.Ed.2d 197] (1979)." 101 S.Ct. at 1883-84.
It was further held:
"... that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police...." 101 S.Ct. at 1884-85.
An attorney had been retained by family of the defendant without her knowledge in State v. Jackson, supra. The lawyer, Ronald Rakosky, telephoned the sheriff's office. He informed the listener he had been employed to represent Ms. Jackson, and requested she not be interrogated further until he could confer with her. The district attorney was called, but was not in his office; a telephone message was left for him. Two deputies interrogated the defendant following the attorney's call, and they obtained a videotaped statement from her. She then was asked whether she or any member of her family had retained a lawyer, and if she knew Rakosky's name or phone number. She replied to the questions in the negative. The deputies continued to question her, and she amplified her earlier statement. The defendant was never informed about Rakosky's telephone call. She was not told he had been retained to represent her, and instructed that she not be interrogated. The sheriff's deputies and district attorney failed to verify Rakosky's *1120 employment as defense counsel, and chose to ignore his calls. This court held:
"Under these circumstances, the interrogation was made without an informed waiver of the defendant's right to the assistance of counsel and to remain silent. When counsel has been retained to represent a prisoner, the governmental authorities cannot deny the lawyer reasonable access to his client, nor may they ignore his request that he be allowed to confer with his client prior to, if not during, the interrogation. Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). See also American Law Institute Model Code of Pre-Arraignment Procedure, Section 140.7 (Tentative Draft No. 6, April 1, 1974). Confessions taken in violation of these principles are constitutionally inadmissible." State v. Jackson, supra, at 737.
In State v. Weedon, supra, the defendant's attorneys telephoned the police to meet them at the Weedon home. Mrs. Weedon's body was discovered in the trunk of the car. The defendant was arrested and advised of his rights. The lawyers gave permission for the defendant to answer questions for the arrest register, but instructed the detectives to not question Weedon about anything pertaining to the crime. The lawyers did not accompany Weedon to the station based on this agreement. The police asked the defendant for personal information regarding "arrestee data." Defense counsel's instructions were violated when the defendant was asked for information on another portion of the form entitled "offense data." The defendant responded that the date and time of the offense was Sunday, September 7 at 10 a. m. The state introduced testimony of the booking procedure as an admission by the defendant that he had killed his wife. The defendant was convicted of manslaughter.
This court found there was no waiver by the accused of his right to presence of counsel and of his right against self-incrimination. The court said Weedon was entitled to rely upon the advice of his attorneys that he could answer questions to complete the arrest register. One officer claimed he did not know of the agreement, but this did not cure its violation.
Defendant had been arrested and charged with aggravated rape in State v. Thucos, supra. He was taken to the station house and advised of his rights, including the right to have an attorney at the interrogation. Thucos refused to sign the rights waiver form, informing the police he wished to remain silent and wanted to see an attorney. The next morning defendant was taken from his cell and brought to the interrogation room despite his earlier assertion of the right to counsel. Defendant was advised of his rights, and signed the waiver form. He made oral inculpatory statements, but refused to make a taped statement and was returned to his cell. The following morning defendant was again taken from his cell and readvised of his rights. A waiver form was not presented to him, but he made a second oral inculpatory statement. Defendant was convicted of aggravated rape. This court reversed the conviction, and remanded the case for a new trial because the statements were obtained in violation of defendant's right to counsel. The court stated:
"... we cannot say that defendant's rights were `scrupulously honored' and that the state met its burden of proof. The officer's initiation of further questioning in this case, after defendant asserted his right to be silent and right to have counsel present during questioning, is fatal to the admissibility of the statements made by the defendant." State v. Thucos, supra, at 1285.
The defendant had been admonished by counsel not to make any statements in State v. Cotton, 341 So.2d 355 (La.1977). The police were aware of counsel's advice. The defendant initiated conversation with the officer and signed a rights waiver form. The statements were admissible because the defendant waived his right to counsel in making them.
*1121 State v. Mouton, 366 So.2d 1336 (La.1978) held statements obtained after the defendant initiated conversation with the police to be admissible. The defendant had asserted his right to counsel, but was unable to reach the attorney. He then questioned police about his activities on the day of the crime.
Police initiated interrogation, contrary to defense counsel's advice that the defendant should not make statements, violates the defendant's right to counsel under Weedon as well as Edwards. Jackson, Weedon, Thucos, Cotton and Mouton uphold the principle enunciated in Edwards. A defendant has not knowingly and intelligently waived his right to counsel when, contrary to counsel's advice, he makes statements in response to further police inquiry. The statements are admissible, however, if the defendant initiates the conversation with the police and waives his rights to silence and to have counsel present.
The defendant in Edwards invoked his right to counsel on the day of his arrest. The police returned the next day without making counsel available to him and obtained statements in violation of his right to counsel. Deputies ignored defense counsel's instructions that his client not be interrogated in State v. Jackson, supra. The videotaped statement was suppressed because it was made in violation of the defendant's right to counsel and right to remain silent upon the advice of counsel. An inculpatory statement was made by the defendant in State v. Weedon, supra, in response to a question by the police. Defense counsel had informed the police that the defendant was not to be questioned. This court relied on Jackson and found no waiver of Weedon's right to the presence of counsel. Interrogation of the defendant in Thucos produced oral statements in violation of his right to counsel. The police initiated conversation with West despite his attorney's instructions on October 1 that he not give any statements. Horton and Smith knew the attorney's instructions, but the record supports the conclusion that Horton induced West to make the statements by telling him of his mother's arrest for murder and promising to help her. The waivers signed by West were also the result of Horton's inducements. The United States Supreme Court stated in Rhode Island v. Innis, supra, at 300-301, 100 S.Ct. at 1689-1690:
"We conclude that the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term `interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."
The trial court properly suppressed the October 3 taped statement.
West made the October 4 statement while believing that he had to talk to the Beauregard police if Horton was to help his mother. West signed rights waiver forms for the Beauregard police even though they told him they could not help his mother. These waivers were invalid because they were prompted by Horton's initial conversation with West. See State v. Welch, 337 So.2d 1114 (La.1976). The Vernon police knew that West's attorney had told him not to make any statements. The Beauregard police should have known this information as well. A defendant deals with the police as a single entity. He is not required to differentiate among city, parish or state officials, or officers who might have been working another shift when his attorney instructed that he not give any statements. Once the defendant has "... expressed his desire to deal with the police only through counsel," Edwards v. Arizona, supra, at 1885, all successive officers who deal with the defendant are held to have knowledge of this fact. The October 4 statement should have been suppressed by the trial court.[2]
*1122 Assignments of Error Nos. 3 and 4
Defendant maintains he was denied a fair trial because the state failed to produce evidence favorable to the defendant under C.Cr.P. 718(1). He submits the state's failure to produce required the court to dismiss the charges, grant a mistrial or grant a new trial.
David Hart allegedly made a statement to James Allen that he had killed a man and had to get out of town. The state had a signed statement by Allen, but did not furnish defendant with a copy. The content of the statement became known to the defense as part of the record during trial testimony by Deputy Larry Smith. The state did provide the defense with a copy of the statement at this point in the trial. The defense used the statement, and thoroughly cross-examined David Hart who denied ever making the statement.[3] Under the circumstances, it appears the failure of the state to furnish this statement to the defendant did not deny him a fair trial.[4]
Assignment of Error No. 5
Defendant urges that the trial court erred in refusing to admit into evidence certain handwritten notes received by him while awaiting trial. The notes were written by Joel Vernon, a "jailhouse lawyer," allegedly for David Hart. The notes were supposedly an attempt to persuade West to change his testimony.
The trial court properly denied admission of the notes. It was not established that Hart authored the notes or directed their writing.
This assignment of error lacks merit.
Assignment of Error No. 6
Defendant argues the trial court erred in denying his motion for a mistrial based on prejudicial testimony. Officer Castleberry of the DeRidder Police Department testified he had "picked up" West about two weeks prior to Calcote's murder.
State v. Douglas, 389 So.2d 1263 (La. 1980), leaves the decision as to the necessity of granting a mistrial to the discretion of the trial court under C.Cr.P. 771. The officer did not state why the defendant was "picked up," or what happened as a result. The officer was properly not allowed to testify about the matter further. We cannot say the testimony prejudiced the jury to the extent that it denied defendant a fair trial.
Decree
The October 4 statement of the defendant was also given in violation of defendant's right to silence and right to counsel. It should not have been admitted into evidence. Accordingly, defendant's conviction is reversed, and sentence is set aside. The case is remanded for a new trial.
DENNIS, J., concurs with reasons.
WATSON, J., concurs in the holding that the October 4 statement should have been suppressed as taken in violation of defendant's right to remain silent and to counsel; it is not necessary to address the issue of retroactivity of Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378.
KLIEBERT and DOUCET, JJ. ad hoc, dissent.
*1123 DENNIS, Justice, concurring.
I respectfully concur.
Although Edwards v. Arizona may be applicable, I do not think it necessary or desirable to resolve the question of its possible retroactivity in this context. West's October 4th statement must be suppressed for an alternative reason: The record as I appreciate it does not justify a finding that the state carried its burden to show that the conditions that rendered the earlier confession inadmissible did not carry over to invalidate the subsequent one. Darwin v. Connecticut, 391 U.S. 346, 88 S.Ct. 1488, 20 L.Ed.2d 630 (1968); Beecher v. Alabama, 389 U.S. 35, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967); Randall v. Estelle, 492 F.2d 118 (5th Cir. 1974); State v. Welch, 337 So.2d 1114 (La.1976). The state while acting through one of its law enforcement agencies cannot be the beneficiary of the coercive tactics of its officers merely because they are employed in a different parishcertainly not unless the second confession is sufficiently removed from the preceding statement in time or circumstances to eliminate the taint created by the first confession. State v. Welch, supra; Cf. Westover v. United States, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
NOTES
[*] Judges Ned E. Doucet, Jr. of the Third Circuit and Thomas J. Kliebert and Robert J. Klees of the Fourth Circuit, participated in this decision as Associate Justices Ad Hoc, joined by Chief Justice Dixon and Associate Justices Calogero, Dennis and Watson.
[1] These facts were taken primarily from the preliminary examination conducted on March 5, 1980, and from defendant's statement of October 4, 1979. The record of the trial transcript is incomplete and does not contain all of the above facts.
[2] The October 1 statement was initiated by the defendant before he requested counsel and Edwards does not apply to it.
[3] James Allen did not testify at trial.
[4] Evidence showed the defendant did know of Allen's statement about Hart before trial. A preliminary hearing was held following West's initial indictment for first degree murder in this case. The indictment was dismissed, and he was later indicted for second degree murder and convicted. The defense learned of the statement at the preliminary hearing in conjunction with the original indictment. However, it is correct that the state had not supplied Allen's statement in compliance with the defense's discovery motions prior to the trial.

We do not condone the state's failure to provide Allen's statement to the defense prior to trial. Hart was involved in the murder, and he claimed West had killed Calcote. West stated Hart had committed the murder. It is quite obvious Hart's alleged statement was exculpatory to West. The statement was allegedly made on the day after Calcote's murder. The state at least knew that Hart was present at the scene of the murder. The defense requested any statements favorable to the defendant, and this one should have been supplied.