I WOODARD, Judge.
Ms. Deirdre Dotson, the Applicant, is charged with the second degree murder of Mr. Albert Dotson, a violation of La.R.S. 14:30.1. She filed a motion to suppress a statement that she gave to Detective Ram-bi Cormier from the Violent Crimes Task Force (VCTF) of the Lake Charles Police Department (LCPD). After a suppression hearing held on April 8, 1998, the trial court denied her motion on May 21, 1998. Ms. Dotson sought a writ of certiorari with this court. In our ruling issued on September 29, 1998, we granted the writ, in part, and denied it, in part. Both she and the State filed writs to the Louisiana Supreme Court which remanded the case for briefing, argument, and opinion. After reconsideration, we grant Ms. Dotson’s writ and reverse the trial court’s decision.
| .FACTS
At some time between 11:00 p.m. and midnight on July 11-12, 1997, Officer William Kettler of the LCPD, followed shortly thereafter by Corporal Phillip Robertson, responded to a shooting at Ms. Dotson’s residence. The officers were responding *688 to a 911 call which she had made. Upon arriving, they discovered Mr. Albert Dotson, of no relation, near death, lying face down on the floor. It was later learned, through Ms. Dotson, that Mr. Dotson had gained access to her home through deceptive means, identifying himself as someone else when she asked who was at the door before opening it and, then, forcing his way in, after which he began choking her and threatening to kill her that night.
When Officer Kettler arrived, he asked Ms. Dotson what had happened. After she explained, he Mirandized her. Corporal Robertson transported her to the LCPD for questioning, and Detective Rambi Cor-mier, from the LCPD’s VCTF, was called in to investigate. At Ms. Dotson’s request, Corporal Robertson called Officer Donald Shillow of the LCPD, a friend of hers well known to the other officers. He briefed Officer Shillow on what had happened and that Ms. Dotson wanted to talk to him. Officer Shillow arrived at the LCPD shortly after the call and was permitted to meet with her where she was being held in the Detective Division. As a result of their conversation, they agreed that she needed representation and that he should call Mr. Ron Ware, a defense attorney known to both of them, on her behalf. He did so, immediately, at the station, and Mr. Ware told him that he would be right there. Ms. Dotson testified that Officer Shillow related this information to her, and Mr. Ware asserted that when he did get to see Ms. Dotson, she immediately told him, “I was looking for you.”
Wflien Detective Cormier arrived at the LCPD around 1:00 a.m., he was told that Ms. Dotson had shot and killed the victim and that she had been informed of her Miranda rights. He went to the Detective Division and asked her if she would talk to him at the VCTF. When she agreed, he stated that he, again, advised her of her rights. Then, they walked through the LCPD’s back steps, where he recalled exchanging a few words with Officer Shillow before driving her to the VCTF.
At 1:35 a.m., in the presence of Officer Lucky Delouche and Assistant District Attorney Wayne Frey, Detective Cormier began a videotaped interview with Ms. Dotson.
_J¿_Mr. Ware arrived there at some time after the interview started. He saw Ms. Dotson’s parents who, he said, also requested, within five minutes of his arrival, that he represent their daughter. Then, he spoke to Mr. Frey and told him that he was there to see his client, Deirdre Dotson. Mr. Frey refused to let him see her until they had completed the interview. At trial, Mr. Frey explained:
I indicated to him [Ware] that Ms. Dotson had said that she did not want an attorney, and that I had no one in the Violent Task Force Offices that was requesting an attorney and I refused to allow his admission.... “You are not telling me that you are representing her. She has said she doesn’t have an attorney and does not want an attorney.”
The officers proceeded with the interview without asking Ms. Dotson if she had requested Mr. Ware’s presence and without informing her that he was there.
Ms. Dotson was subsequently charged with second degree murder, a violation of La.R.S. 14:30.1. On May 21, 1998, after a suppression hearing held on April 8, 1998, the trial court denied her motion to suppress the statement that she gave at the VCTF. She filed a writ with this court, and on September 29, 1998, we ruled as follows:
WRIT DENIED IN PART; WRIT GRANTED AND MADE PEREMPTORY IN PART: We uphold the trial court’s ruling as to the portion of the Defendant’s statement, including the videotaped version, made before the interrogating officers were aware that an attorney was present and had requested to speak to the Defendant. However, we find the portion of the statement given after this point should have been suppressed because the officers failed to *689 inform the Defendant that counsel was available and had requested to speak with her. See State v. Matthews, 408 So.2d 1274 (La.1982), appeal after remand, 450 So.2d 644 (La.1984) and State v. Serrato, 424 So.2d 214 (La.1982). Accordingly, we reverse the trial court’s ruling as to this portion of the statement, including the videotaped version, and remand this case for further proceedings consistent herewith.
Both the Defendant and the State filed writs to the Louisiana Supreme Court which remanded the case for briefing, argument, and opinion. State v. Dotson, 98-2630 (La.7/2/99); 745 So.2d 626 and 98-2764 (La.7/2/99); 745 So.2d 627.
[¿ASSIGNMENTS OF ERROR
The trial court erred in:
1. Finding that Ms. Dotson did not invoke her right to counsel.
2. Finding that Lake Charles Police Officer Donald Shillow’s knowledge of her invocation of her right to counsel was not imputable to his fellow law enforcement officers.
3. Holding that it was proper for the police to continue to question her after her attorney had arrived and demanded to see her, and in withholding that information from her.
4. Refusing to suppress her videotaped statement, which statement was obtained in violation of her constitutionally protected rights.
LAW
Invocation op the Right to Counsel
Ms. Dotson urges that she invoked her right to counsel when she asked Officer Shillow to contact Mr. Ware on her behalf and that she felt no need to request an attorney, again, when the officers read her rights because she had already done so and knew that Mr. Ware was on his way, as Officer Shillow had so informed her. On the other hand, the State argues that because she did not ask one of the other officers with whom she came into contact, she never requested an attorney and that she intelligently and voluntarily waived her right to one.
The Sixth Amendment of the United States Constitution sets forth an individual’s right to assistance of counsel in a criminal investigation. This Sixth Amendment right does not attach until adversarial criminal proceedings are initiated, Davis v. U.S., 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), which means that, under this Amendment, the suspect of a criminal investigation has no constitutional right to be assisted by counsel. Id. Nevertheless, in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court held that a person who was subject to custodial interrogation had the right to consult with, and be assisted by, an attorney during questioning as a procedural safeguard to that individual’s right against compulsory self-incrimination. See U.S. Const. amend. V; Davis, 512 U.S. 452, 114 S.Ct. 2350; Michigan v. Tucker, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974); La. Const. art. V, § 13.
The right to counsel declared in Miranda, is sufficiently important that its waiver must comply with the “[k]nowing and intelligent waiver standard.” Edwards v. Arizona, 451 U.S. 477, 483, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378 (1981). Moreover, after waiving his Miranda rights, if an accused later “[expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.” (Emphasis added.) Edwards, 451 U.S. at 485-86, 101 S.Ct. at 1885. Thus, after a defendant invokes his right to counsel, there can be no further attempt to seek a retraction. U.S. v. Crisp, 435 F.2d 354 (7th Cir.1970)
*690 In McNeil v. Wisconsin, 501 U.S. 171, 178, 111 S.Ct. 2204, 2209, 115 L.Ed.2d 158 (1991), the court somewhat defined the term, “expressed his desire,” as follows:
It requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police.
(Emphasis provided.) Also, in Davis, 512 U.S. 452, 458-59, 114 S.Ct. 2350, 2355, the United States Supreme Court specified:
The applicability of the “ ‘rigid’ prophylactic rule” of Edwards requires courts to “determine whether the accused actually invoked his right to counsel.” To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry. Invocation of the Miranda right to counsel “requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.” But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning. (“[T]he likelihood that a suspect would wish counsel to be present is not the test for applicability of Edwards ”)
[[Image here]]
Rather, the suspect must unambiguously request counsel. As we have observed, “a statement either is such an assertion of the- right to counsel or it is not.” Although a suspect need not “speak with the | (^discrimination of an Oxford don,” he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, Edwards does not require that the officers stop questioning the suspect.
(Emphasis provided) (citations omitted).
In the case sub judice, at the suppression hearing, Ms. Dotson recalled the following conversation with Officer Shillow:
[I] said I haven’t contacted my attorney. And I work in the judicial system but I was just — I couldn’t remember anything. I was just like out of it. I told him, I said, I work with this every day, but I cannot think of nobody [sic] that I can call right now. And he said, well, what about Ron Ware? You know Ron. I said yeah, I said, Ron lives down the street from my parents. I said, that would be fíne, please call him for me .... And that’s when he went to the back and called Mr. Ware for me.
(Emphasis added.)
On cross examination, when asked if she told Detective Cormier that she had requested an attorney, Ms. Dotson stated that no one asked her if she had contacted an attorney. She also confirmed that she had not told the interviewing officers of her request to speak to Mr. Ware. She acknowledged being told of her right to contact an attorney before answering any questions, but explained that she did not ask for one because she had already done so and was waiting for him to arrive.
When the State questioned her further about her visit with Officer Shillow, the following exchange took place:
Q Would you consider yourself a close friend of his?
A Well, we’re friends, yeah. We’re pretty close, yeah.
[[Image here]]
Q Okay. And so y’all had a chat as friends, didn’t you?
A Yes.
Q And that’s when the subject of maybe it’d be best to call a lawyer came up, right?
A Yes, ma'am, uh-huh.
*691 |7Q Okay, did you tell Mm to tell anybody that you wanted a lawyer?
A No, I didn’t tell him to tell — No, I just asked him to call Mr. Ware for me, and he did.
[[Image here]]
Q And when did you mention to them that you wanted [Mr. Ware]?
A Well, I figure they would know,—
Q How?
A —because I knew he was gonna show up eventually, I knew he was on his way because Shillow had informed me and he said he was on his way at the — when we were at the police department.
Q But you didn’t tell these detectives anything about that, did you?
A No, I didn’t tell them. No.
(Emphasis added.) Regarding this conversation, Officer Shillow testified as follows, first to questions from the State and, then, to Defense Counsel:
Q After your arrival at the detective division, did you have occasion [sic] to converse with Deirdre Dotson?
A Yes, I did.
[[Image here]]
Q At any point, did you and she discuss her general need to consult with an attorney?
A We talked about who she had contacted, and she said she was unable to contact her parents. Specifically an attorney, I don’t remember us directing it towards that.
Q Did at some point the conversation ever turn to her need to consult a lawyer?
A I think we did talk about — I’m not sure if I asked her, but she told me she hadn’t contacted her lawyer; she hadn’t contacted any type of attorney or anyone because — due to her parents — she hadn’t contacted her parents or any type of an attorney.
Q Okay. Did you — -all at that-at some point discuss in general, her need to contact some attorney?
|SA We talked about contacting someone. Through our discussion, we agreed on contacting Ron Ware because he lives in the same neighborhood with [sic] her parents.
[[Image here]]
Q Did you contact Ron Ware?
A Yes, I did.
Q Was it as a result of the conversation you had with Deirdre Dotson

A Yes, it was.

[[Image here]]
Q What did Mr. Ware tell you he intended to do?
A He would be right there.
Q Did he say, I will be right there?
A Yeah, he said, “I’m on my way.”
[[Image here]]
Q Did she ever tell you that, oh, I should have called a lawyer before I said anything?
A No.
Q Did she ever say, I need a lawyer?
A No.
Q Did she ever say, I want a lawyer?
A No.
Q Did she ever make it clear to you, unequivocally, that she indeed wanted a lawyer present before she was questioned by anybody in the law enforcement?
A I don’t really remember if it was in that direct, [sic] because we came up — when—through our conversation, we came to contact Ron Ware. So I’m not sure if she said directly, I need a lawyer; I don’t remember.
Q Did you suggest this?
IflA No. I mean, we — through our conversation we came up with it.
[[Image here]]
Q Okay. But she didn’t say, I don’t want to talk to anybody till I talk to a lawyer?
*692 A No, she didn’t say that.
[[Image here]]
DEFENSE COUNSEL:
Q Did I not ask you this morning, point blank, whether you did not discuss with Deirdre her need for an attorney, given the situation as you understood it?
A This morning I told you that we contacted Mr. Ware through our conversation as — she need ... — as advice, because her parents were unable to be contacted [sic]. Knowing that he lives in the same neighborhood with her parents, I contacted — or we decided to contact Mr. Ware for assistance as a friend and as legal advice.
Q For legal advice, too?
A And for legal advice.
(Emphasis added.)
Mr. Ware testified that Officer Shillow called him because Ms. Dotson “need[ed] a lawyer.” In essence, Mr. Ware explained that he knew of her but “[knew] nothing about her personal life at all.” Then, he said: “I got up, got dressed, got a legal pad, pen, put it in my pocket, legal pad under arm, got dressed.”
When it denied Ms. Dotson’s motion to suppress, the trial court found that:
After evaluating the facts with the above clear legal guidelines, an objective inquiry results in the inescapable conclusion that there was no invocation by the defendant of her right to counsel. In essence, Shillow, there as a friend with access to the back, asked defendant if she needed an attorney and/or if she knew one. He then suggested Ron Ware and offered to contact him on her behalf. This Court finds this exchange does not amount to a “reasonably construed ... expression of a desire for the assistance of an attorney[.]”
|inIn the case sub judice, the trial court seemed to predicate its decision, in part, on its impression that Officer Shillow had led the entire conversation, asked Ms. Dotson if she needed representation, suggested Mr. Ware, offered to contact him on her behalf, and that Ms. Dotson had nothing to do with any of it; therefore, she had not invoked her right to counsel. The record proves the trial court’s factual findings to be in error. The statements above are some of the evidence which contradicts the court’s findings. Ms. Dotson’s and Officer Shillow’s testimonies, in essence, reveal that, first, they discussed whether she had contacted an attorney and, then, whether she might need an attorney, which without more would not constitute an invocation of her right to counsel; second, that as a result of this conversation, she asked Officer Shillow to call Mr. Ware or they both agreed that she should have Ron Ware and she wanted Officer Shillow to call him in on her behalf, which the Officer immediately did at the station, and Mr. Ware responded that he would be right there. Third, in the middle of the night, with a legal pad in hand ready for work, Mr. Ware did show up at the LCPD shortly after Officer Shillow had called him and asked to speak with Deirdre Dotson, his client.
Whether Ms. Dotson, alone, reached the conclusion to call Mr. Ware or whether she and Officer Shillow came up with it together is of no moment. What is important is that, ultimately, she acknowledged that she needed to have an attorney, asked Officer Shillow to contact one for her, and he understood her request because he acted on it. Thus, Ms. Dotson’s discussion with Officer Shillow is clearly distinguishable from unspecific statements that defendants made to police officers in other cases, which the respective courts deemed equivocal and, therefore, not sufficient to invoke their right to an attorney; for example, “Maybe I should talk to a lawyer,” Davis, 512 U.S. at 462, 114 S.Ct. at 2357, or “After all this here, do I still get a lawyer?” State v. Kelly, 95-1663, p. 4 (La.App. 3 Cir. 5/8/96); 677 So.2d 495, 498.
*693 After reviewing the evidence as a whole, we find that the trial court erred when it found that Ms. Dotson did not invoke her right to counsel in such a fashion sufficient to pass the Davis threshold.
Having found that Ms. Dotson did request an attorney, we now turn to the issue of whether Officer Shillow’s knowledge of Ms. Dotson’s request for an attorney should be imputed to the officers who subsequently questioned her.
| v1Imputability
In U.S. v. Lenfesty, 923 F.2d 1293, 1297 (8th Cir.1991), the court stated that “[kjnowledge of a suspect’s request for counsel made to one officer is imputed to all the other police officers involved in the case.” Also, in State v. West, 408 So.2d 1114, 1121 (La.1982), our supreme court stated:
A defendant deals with the police as a single entity. He is not required to differentiate among city, parish or state officials, or officers who might have been working another shift when his attorney instructed that he not give any statements. Once the defendant has “... expressed his desire to deal with the police only through counsel,” Edwards v. Arizona, supra, at 484, 101 S.Ct. at 1885, all successive officers who deal with the defendant are held to have knowledge of this fact.
(Emphasis added.) See also State v. Trevathan, 414 So.2d 316 (La.1982). Later, in State v. Arceneaux, 425 So.2d 740 (La. 1983), the Louisiana Supreme Court reasserted the essence of its holding in West. In Arceneaux, when interrogated by Officer McCann of the Sulphur Police Department, the defendant stated that he wanted to talk to an attorney. Questioning ceased, but later, Officer Steach of the Calcasieu Parish Sheriffs Office, unaware of the defendant’s request for counsel, obtained an oral confession from the defendant. The defendant refused to give a written statement, saying that he wanted to talk to an attorney. Once again, questioning ceased. The court stated:
[I]t is of no moment that Steach did not know of defendant’s request for counsel. Good faith is not relevant because once the defendant has expressed his desire to deal with the police only through counsel, all successive officers who deal with the defendant are held to have knowledge of this fact.
Id. at 744 (emphasis added). Thus, the court found the statement to Officer Steach to be inadmissible.
We read West and Arceneaux in the context of Arizona v. Roberson, 486 U.S. 675, 687-88, 108 S.Ct. 2093, 2101, 100 L.Ed.2d 704 (1988), where the United States Supreme Court stated:
Finally, we attach no significance to the fact that the officer who conducted the second interrogation did not know that respondent had made a request for counsel. In addition to the fact that Edwards focuses |1?on the state of mind of the suspect and not of the police, custodial interrogation must be conducted pursuant to established procedures, and those procedures in turn must enable an officer who proposes to initiate an interrogation to determine whether the suspect has previously requested counsel. In this case respondent’s request had been properly memorialized in a written report but the officer who conducted the interrogation simply failed to examine that report .... The police department’s failure to honor that request cannot be justified by -the lack of diligence of a particular officer.
(Emphasis added.)
In the case sub judice, when the trial court found that Ms. Dotson’s request for counsel to Officer Shillow should not be imputed to the other officers of the LCPD, it stated:
Assuming for the sake of the argument, that the colloquy between defendant and Shillow amounts to an invocation of a desire to get a lawyer before *694 questioning, there is no imputation to the officers involved.
None of this conversation was made known to anyone else at any time pertinent to defendant’s capacity to comprehend and knowingly relinquish her constitutional rights. She was Mirandized before and after this discussion with Shillow and said nothing about a lawyer. She had the added advantage of working in the system.
Also, there was no possible procedure for the Violent Crimes Task Force to follow which would have put them on notice that a conversation concerning an attorney took place between the defendant and Shillow, less they be soothsayers.
[[Image here]]
I don’t think that the rights being protected envision a situation where a friend, who happens to be a police officer, is utilized to call an attorney, particularly when that friend and nor the defendant [sic] ever tell the true policemen at issue during the incident about the desire.to talk to a lawyer. So, I don’t view Shillow as having been a conduit to the police in this case, so as to make the constitutional rights attach.... It would be placing an intolerable burden upon them. They would then, in effect, have to be soothsayers, readers of the mind, and that’s not in my opinion, proper, possible or permissible.
(Emphasis added.)
The trial court’s analysis and conclusions present several problems.
1 ^Officer Shillow’s Status
The first problem that we find in the trial court’s decision deals with the role that Officer Shillow played. The trial court characterized him as a “friend with access to the back.” Unlike the trial court, we are more impressed with his “access to the back” than his relationship with Ms. Dotson. The record reveals that Officer Shillow was permitted access to Ms. Dotson when her request to see her aunt, who was also present at the police station, was denied, and, later, at the VCTF, neither were her parents permitted access to her before she gave the videotaped statement. Further, on the State’s re-cross examination of Detective Welch, he revealed that it is standard procedure not to leave any non-employee unattended in the Detective Division where Ms. Dotson was being held and where Officer Shil-low was permitted to speak with her.
Moreover, the record discloses that Officer Shillow may have gained access to potential evidence, which, presumably, would have been unavailable to, simply, a friend. Therefore, if Officer Shillow only intervened as a friend, he should have been treated accordingly, and been required to remain in that part of the police station where friends and family were relegated to stay. Thus, for the purpose of imputability, we find that it was Officer Shillow’s status as a police officer, not as a friend, which gained him access to Ms. Dotson and to potential evidence and which allowed him to become involved in her case defacto.
Our findings regarding Officer Shillow’s involvement in Ms. Dotson’s case are strengthened by the following. When being interviewed by Detective Cormier, Ms. Dotson was trying to figure out why she had not heard from Mr. Dotson all day when he would usually call before coming to her house. She remarked:
He (Mr. Dotson) must have called my job because when Shiloh [sic] was listening to the answering machine he (Shil-low) said he (Mr. Dotson) asked — was asking me where I had been, or where was I, or something like that.
This shows that Officer Shillow would have had access to her answering machine, potential evidence, only after the shooting and, presumably, only with the LCPD’s permission. He, then, would have had to relate this information to Ms. Dotson at the station when he spoke to her before she gave her videotaped statement.
*695 | uTherefore, we find that it was reasonable for Ms. Dotson to believe that by telling Officer Shillow that she wanted an attorney, the other officers would know. Police Procedures
Next, we address the trial court’s concern regarding police procedures. The court stated that:
[TJhere was no possible procedure for the Violent Crimes Task Force to follow which would have put them on notice that a conversation concerning an attorney took place between the defendant and Shillow, less they be soothsayers.
There may have been no procedures, but we find that there, both, could and should have been. In Roberson, 486 U.S. at 687, 108 S.Ct. at 2101, the United States Supreme Court asserted, in part:
[Cjustodial interrogation must be conducted pursuant to established procedures, and those procedures in turn must enable an officer who proposes to initiate an interrogation to determine whether the suspect has previously requested counsel. ... The police department’s failure to honor that request cannot be justified by the lack of diligence of a particular officer.
(Emphasis added.)
In the case sub judice, the officers did not take advantage of the numerous opportunities they had to discover the vital information of whether Ms. Dotson had requested counsel of anyone. For example, upon entering the Detective Division where she was located, Officer Cormier recalls the following:
When I walked in, I probably said hi [sic] to Officer Robertson and Officer Welch. I talked to Ms. Dotson and advised her of Miranda [sic], and then we left, and on the way out, I had — I spoke a couple of words to Sergeant Shillow.
He stated that Officer Shillow, “asked [him] a question, and [he] answered the question....” Yet, Detective Cormier apparently never asked Officer Shillow what he was doing there, nor did he ask Officers Robertson or Welch what had happened since their 11 ¡¡arrival at the police station— whether Ms. Dotson had requested to see counsel or had talked to anyone. In turn, Officer Robertson, presumably, did not advise Detective Cormier that Ms. Dotson had asked him to call Officer Shillow for her. Obviously, such a fact was important, as Officer Shillow was the only one permitted to extensively speak with her after she arrived at the LCPD. And there is no evidence in the record that Officer Shillow, knowing very well Miranda’s mandates, communicated to his fellow officers that he had called Mr. Ware at Ms. Dotson’s request, a fact that would have been in his “friend’s” best interest.
Based on the foregoing jurisprudence, Officer Shallow's knowledge of Ms. Dotson’s request for counsel must be imputed to the rest of the LCPD. By enforcing the precepts of Roberson, we do not believe that we are placing upon law enforcement the burden to become “soothsayers,” as the trial court suggested. Although our laws should enable law enforcement to seek the truth and gather evidence in the course of their investigation, investigations should not be conducted without restraints and in a way which disrespects the legal precepts set forth in Miranda and Ed-ivards. At the very least, law enforcement in this case should not have interrogated Ms. Dotson without taking the precautionary steps provided for in Roberson, because to do so would, in fact, defeat the very purpose behind, and spirit of, the Miranda and Edwards decisions.
It would not have been a burden for the interrogating officers to simply ask the question — Did she request an attorney?— or for Officer Shillow, an experienced officer with the LCPD well informed of all relevant legal principles, to have passed on this information to the interrogating officers. Indicative of the LCPD’s approach to this case is the way the State handled Mr. Ware’s request to see his client, Ms. Dotson, when he showed up at the VCTF interview room at approximately 1:30 a.m.
*696 Neither clairvoyance nor soothsaying was required to find out if she had previously requested an attorney when a simple procedure could, and should, have been followed “to determine whether the suspect has previously requested counsel.” Roberson, 486 U.S. at 687, 108 S.Ct. at 2101.
116 Admissibility
After finding that Ms. Dotson requested counsel and that her request was imputed to the LCPD, the focus of our inquiry becomes whether the statements made in her videotaped interview are inadmissible under Edwards.
In the instant case, the record reflects that Ms. Dotson requested assistance of counsel before Detective Cormier interviewed her and that subsequent to her request, Detective Cormier, not Ms. Dotson, initiated the further contact which led to her consent to give a videotaped interview. Accordingly, under Edwards, we exclude the statements that Ms. Dotson made at Detective Cormier’s request, as well as the resulting videotape. Thus, we reverse this part of the trial court’s decision.
Our resolution of this assignment of error pretermits our discussion of Ms. Dotson’s other assignments of error.
CONCLUSION
Ms. Dotson requested to Officer Shillow, a police officer with LCPD, the presence of counsel before Officer Cormier asked her to consent to an interrogation. We find that Officer Shillow’s knowledge was imputed to the interrogating officers. After requesting counsel, Ms. Dotson never initiated further contact. The officers did so when they Mirandized her and pursued their interrogation. Thus, the trial court should have granted her motion to suppress her statement and accompanying videotape. Accordingly, we reverse the trial court’s decision to deny the motion, and grant the Ms. Dotson’s writ application. We exclude the statements that Ms. Dotson made at Detective Cormier’s request as well the resulting video tape.
WRIT GRANTED AND MADE PEREMPTORY.