# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**03-940**

**STATE OF LOUISIANA**

**VERSUS**

**BRIAN KEITH POULLARD**

**\*\*\*\*\*\*\*\*\*\***
APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 01-K-5046-C
HONORABLE ALONZO HARRIS, DISTRICT COURT JUDGE

**\*\*\*\*\*\*\*\*\*\***
**ULYSSES GENE THIBODEAUX**
**JUDGE**
**\*\*\*\*\*\*\*\*\*\***

Court composed of Ulysses Gene Thibodeaux, Oswald A. Decuir, and Jimmie C. Peters, Judges.

**AFFIRMED.**

**James Edward Beal**
**Louisiana Appellate Project**
**P. O. Box 307**
**Jonesboro, LA 71251-0307**
**Telephone: (318) 259-2391**
    **COUNSEL FOR:**
        **Defendant/Appellant - Brian Keith Poullard**

**Earl B. Taylor**
**District Attorney, 27th Judicial District Court**
**P. O. Drawer 1968**
**Opelousas, LA 70571-1968**
**Telephone: (337) 948-3041**
    **COUNSEL FOR:**
        **Plaintiff/Appellee - State of Louisiana**

**Brian Keith Poullard**
**Hunt Correctional Center**
**Hwy. 74, P. O. Box 788**
**St. Gabriel, LA 70776-0174**

THIBODEAUX, Judge.

The Defendant, Brian Keith Poullard, appeals his second degree murder conviction by a jury on the basis that the trial court improperly admitted into evidence an inculpatory statement made to a law enforcement officer. The statement should have been suppressed, he argues. While we agree that the statement, "f_ _k you, I'll do the same thing to you and uh—if I don't do it myself, I can call someone to do it while I'm in jail," was erroneously admitted after the Defendant invoked his right to counsel, the error was harmless in light of the overwhelming evidence of guilt against the Defendant. We, therefore, affirm the Defendant's conviction and sentence.

**FACTS**

The Defendant was arrested for the murder of Gerald Lee Guidry on November 30, 2001 at Mr. Guidry's used car lot in Opelousas. After his arrest, the Defendant was immediately *Mirandized* by Deputy Ryan Young. He was brought to the Eunice Police Department. A videotape made in the booking room is somewhat unclear, but it appears the Defendant told Officer Stagg "no lawyer, can't talk." Officer Stagg informed the Defendant that he did not have to discuss the incident. Officer Tony Kennedy then read the Defendant his rights and continued to talk about an unrelated incident.

After the Defendant was taken to a holding cell, Lieutenant Varden Guillory of the Eunice Police Department approached him and asked "why he didn't feel any remorse for what he did—for taking a person's life." The Defendant, according to Lieutenant Guillory, responded by saying, "f _ _ k you, I'll do the same thing to you and uh—if I don't do it myself, I can call someone to do it while I'm in jail." Lieutenant Guillory did not *Mirandize* the Defendant before speaking to him because he intended only to have a "casual conversation" with the Defendant.

1

The trial court concluded the statement was made freely and voluntarily. It refused to suppress the statement and observed that five *Mirandized* rights forms had been executed within a short period of time by the Defendant.

## LAW AND DISCUSSION

> A trial judge's ruling on whether or not a statement is voluntary is given great weight and will not be disturbed on appeal unless clearly unsupported by the evidence. *State v. Thornton*, 351 So.2d 480, 484 (La.1977). Before a confession may be introduced into evidence, the state must establish that the accused was advised of his constitutional rights under Article 1, Section 13 of the Louisiana Constitution and the Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *State v. Simmons*, 443 So.2d 512 (La.1983). In *Miranda*, the United States Supreme Court recognized the coercive atmosphere created by police custody and established a procedural mechanism to safeguard the exercise of a defendant's Fifth Amendment rights. Before interrogating a suspect in custody, law enforcement officials must inform the suspect that he has the right to remain silent, that his statements may be used against him at trial, that he has a right to an attorney, and that if he cannot afford an attorney, one will be appointed for him.
>
> Even when a defendant has not expressly invoked his rights under *Miranda*, "[t]he courts must presume that a defendant did not waive his rights." *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979). A waiver is not established by showing that a defendant was given the complete *Miranda* warnings and thereafter gave an incriminating statement. 2 Wayne R. LaFave, Jerold Israel, Nancy King, Criminal Procedure, § 6.9(d). Moreover, it is well-settled that a "heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Tague v. Louisiana*, 444 U.S. 469, 470, 100 S.Ct. 652, 653, 62 L.Ed.2d 622 (1980).

*State v. Vigne*, 01-2940, p. 6 (La. 6/21/02), 820 So.2d 533, 537.

> When . . . a defendant has expressly waived his *Miranda* rights, the question becomes "whether the purported waiver was knowing and intelligent . . . under the totality of the circumstances." *Abadie, supra,* 612 So.2d [1] at 5 [(La.), *cert. denied,* 510 U.S. 816, 114 S.Ct.

2

66 (1993)], *quoting Oregon v. Bradshaw,* 462 U.S. 1039, 1044-46, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983). This "totality of the circumstances" includes "the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." Solem v. Stumes, 465 U.S. 638, 647, 104 S.Ct. 1338, 1344, 79 L.Ed.2d 579 (1984), *quoting Butler, supra,* 441 U.S. at 374-375, 99 S.Ct. at 1757-1759. *See also State v. Wilson,* 467 So.2d 503 (La.1985), *cert. denied,* 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 246 (1985); *re'hg denied,* 474 U.S. 1027, 106 S.Ct. 585, 88 L.Ed.2d 567 (1985) (diminished intellectual capacity of defendant only a factor to be considered in determining whether *Miranda* waiver knowing and intelligent).

> In reviewing the correctness of a trial judge's ruling on a motion to suppress a confession, "we are not limited to the evidence adduced at the hearing(s) on this motion, but rather may consider all pertinent evidence adduced at trial." *State v. Brooks,* 92-3331, Slip Op. P. 10 (La. 1/17/95), 648 So.2d 366, 372, *citing State v. Chopin,* 372 So.2d 1222, 1223 n. 2 (La.1979) (*listing cases*).

*State v. Green*, 94-0887, pp. 10-11 (La. 5/22/95), 655 So.2d 272, 280-81, *writ denied*, 00-3351 (La. 8/24/01), 795 So.2d 339.


### Defendant's Understanding of His Rights

The Defendant alleges his statement to Officer Guillory should have been suppressed because he did not understand his rights when they were read to him by Detective Young. Testimony at the hearing on the Motion to Suppress indicated Detective Young *Mirandized* the Defendant at the time he was arrested. Detective Young testified at trial regarding the Defendant's understanding of his rights as follows:

> A.    I told him he had the right to remain silent, anything you say may could--would be used against him in a court of law, he had the right to have an attorney present before and during any questioning. If he decided to answer questions now without an attorney present, he had the right to stop answering questions any time until an attorney was present.
>
> Q.    And did he give you any indication that he understood fully what you said?

A.     The defendant was making comments. I was not sure what exactly he was saying.  He was--his attitude was very excited.  I wouldn't say violent, but excited.  And I don't know if he fully understood what was told to him, but it was told to him in a plain manner where it should have been understood by any reasonable person.

Q.     And in that situation, at that time you felt he was a reasonable person?

A.     I felt that he should have understood what he was told, yes, ma'am.

Based on this testimony we cannot say that the Defendant understood his rights when he was *Mirandized* by Detective Young.  However, Officer Kennedy *Mirandized* the Defendant shortly after he arrived at the Eunice Police Department and the video tape indicates the Defendant stated he understood those rights.  The Defendant was also *Mirandized* by Deputy Vernon Marks who testified that the Defendant indicated he understood his rights and signed a waiver of rights form.  The Defendant had been advised of his rights three times before he spoke to Officer Varden Guillory.  The Defendant has not presented evidence that he did not understand his rights when he was informed of them by Officer Kennedy and Deputy Marks.

### Failure of Officer Guillory to *Mirandize* the Defendant

The Defendant alleges that his statement to Officer Varden Guillory should have been suppressed because Officer Guillory did not *Mirandize* him.

This court has held that *Miranda* rights need not be repeated before each interrogation.  *State v. Bolden*, 95-749 (La.App. 3 Cir. 4/17/96), 680 So.2d 6, *writ denied*, 96-1272 (La. 11/22/96), 683 So.2d 286, *cert. denied*, 529 U.S. 1112, 120 S.Ct. 1969 (2000); *State v. Bordelon*, 597 So.2d 147 (La.App. 3 Cir.), *writ denied*, 600 So.2d 678 (La.1992).

4

> The term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. *Abadie*, 612 So.2d [1]at 6 [(La.1993)] (citing [*Rhode Islandv.*] *Innis*, 446 U.S. at 301, 100 S.Ct. at 1689-90).

*State v. Payne*, 01-3196, p. 14 (La. 12/4/02), 833 So.2d 927, 938.

Although Officer Guillory testified that he went to the Defendant's cell in order to have a "casual conversation," the question by Officer Guillory was reasonably likely to elicit an incriminating response and was the functional equivalent of interrogation.

The Defendant had been *Mirandized* on three previous occasions, the last time being at 2:02 p.m. The statement at issue made by the Defendant to Officer Guillory occurred at approximately 4:00 p.m. Officer Guillory was not required to *Mirandize* the Defendant before speaking to him inasmuch as there had not been a significant break in the interrogation process. In *Bordelon*, 597 So.2d 147, this court held that police were not required to readvise a defendant of his *Miranda* rights when questioning him a second time eleven hours after initial interrogation during which his rights were read.

### "No Lawyer, Can't Talk"

During the booking process, the Defendant said what sounded like "I can't talk without my lawyer," made several unintelligible comments about the law, and then said "no lawyer, can't talk."

> A defendant's right to counsel is guaranteed in LSA Const. art. I, § 13. When counsel is requested, interrogation must cease; officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney. *Minnick v. Mississippi*, 498 U.S. 146, 153, 111 S.Ct. 486, 491, 112 L.Ed.2d 489 (1990). If before or during interrogation an

accused asks for counsel, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated, custodial interrogation even if he has been advised of his rights. Such an accused is not subject to further interrogation by the authorities until counsel is present, unless the accused himself initiates further communication, exchanges, or conversations with the police. *Edwards v. Arizona*, 451 U.S. 477, 485, 101 S.Ct. 1880, 1884-1885, 68 L.Ed.2d 378 (1981).

*State v. Williams*, 01-1650, p. 7 (La. 11/1/02), 831 So.2d 835, 842-43.

The Supreme Court stated the invocation of [the right to counsel] ". . . requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney **in dealing with custodial interrogation by the police.**" *McNeil*[*v. Wisconsin*]*,* 501 U.S. [171] at 178, 111 S.Ct. [2204] at 2209 (emphasis in original).

The applicability of the "'rigid' prophylactic rule" of *Edwards* requires courts to "determine whether the accused **actually invoked** his right to counsel." *Davis v. United States,* 512 U.S. at 458, 114 S.Ct. [452] at 2355 (emphasis in original) (citations omitted). To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry. *Davis,* 512 U.S. at 458-459, 114 S.Ct. at 2355. Invocation of the *Miranda* right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *Davis,* 512 U.S. at 459, 114 S.Ct. at 2355 (citation omitted). If a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable police officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, the cessation of questioning is not required. *Id.* (emphasis in original). The suspect must articulate his desire to have counsel present with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. *Id.*

*State v. Payne*, 01-3196, pp. 9-10 (La. 12/4/02), 833 So.2d 927, 935.

### Custodial Interrogation

The State submits that the comment invoking the right to counsel occurred during the booking procedure and not during an interview and was made to Officer Stagg who did not take a statement from the Defendant.

"Because the presence of both a custodial setting and official interrogation is required to trigger the *Miranda* right-to-counsel prophylactic, absent one or the other, *Miranda* is not implicated." *Payne*, 833 So.2d at 934.

> [T]he Supreme Court in *Miranda* explained what is meant by custodial interrogation: "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Rhode Island v. Innis*, 446 U.S. at 298, 100 S.Ct. at 1688 (citing *Miranda v. Arizona*, 384 U.S. at 444, 86 S.Ct. at 1612)(emphasis added).

*Id*.

In *State v. Dotson*, 98-926 (La.App. 3 Cir. 11/24/99), 747 So.2d 686, *writ denied*, 99-3616 (La. 3/17/00), 756 So.2d 1142, this court concluded that the defendant invoked her right to counsel when she asked an officer to contact a specific attorney on her behalf and did not tell other officers that she had requested an attorney when she was read her rights prior to being questioned.

The Defendant's comments regarding a lawyer were made not while he was being interrogated, but during the booking process. However, based on *Dotson*, a defendant can invoke the right to counsel prior to being interrogated.

**Invocation of the Right to Counsel**

In *State v. Kelly*, 95-1663, p. 6 (La.App. 3 Cir. 5/8/96), 677 So.2d 495, 499, the defendant stated, "After all this here, do I still get a lawyer." This court found that the statement was not a request for the immediate presence of an attorney. In *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350 (1994), the Supreme Court held that an equivocal or ambiguous statement, such as "maybe I should talk to a lawyer," was insufficient to constitute an invocation of the right to counsel. In *State v. Boudreaux*, 597 So.2d 1235 (La.App. 3 Cir.), *writ denied*, 609 So.2d 223 (La.1992), the state argued the defendant said, "Since you are trying to stick it all on me, I might

7

as well get an attorney." Defense counsel argued the defendant stated, "I might have to get an attorney." This court concluded that based on these comments there was no indication that the defendant requested the immediate presence of an attorney or that he desired the interview to cease. In *Soffar v. Cockrell*, 300 F.3d 588, 595 (5th Cir. 2002), the United States Fifth Circuit Court of Appeals, sitting *en banc*, analyzed several cases dealing with the issue of what is required for an unequivocal invocation of the right to counsel; it concluded that Soffar did not unambiguously invoke his right to counsel when he asked "whether he should get an attorney; how he could get one; and how long it would take to have an attorney appointed."

This case is distinguishable from the above cases. Defendant said "no lawyer, can't talk." Additionally, it appears Defendant said "I can't talk without my lawyer." These comments show the Defendant unequivocally invoked his right to counsel.

> [O]nce a suspect invokes the *Miranda* right to counsel for interrogation regarding one offense, he may not be reapproached regarding any offense unless counsel is present. *McNeil v. Wisconsin*, 501 U.S. 171, 111 S.Ct. 2204, 2208, 115 L.Ed.2d 158 (1991), citing *Arizona v. Roberson*, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988).

> Therefore, once a suspect asserts his *Miranda* right to counsel, not only must the current interrogation cease, but he may not be approached in connection with any further criminal investigation until his counsel is present. *McNeil v. Wisconsin*, 501 U.S. 171, 111 S.Ct. 2204, 2208, 115 L.Ed.2d 158 (1991). And if the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards. *Id*.

*State v. Abadie*, 612 So.2d 1, 5 (La.), *cert. denied*, 510 U.S. 8169, 114 S.Ct. 66 (1993).

> When a defendant invokes his Miranda right to counsel, the admissibility of his subsequent confessions

under federal law is to be determined by a two-step analysis: it first must be asked whether defendant "initiated" further conversation, and if the answer is yes it then must be inquired whether defendant waived his right to counsel and to silence, "that is, whether the purported waiver was knowing and intelligent * * * under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." *Oregon v. Bradshaw*, 462 U.S. 1039, 1044-46, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983); See LaFave & Israel, § 6.9, at 538.

*Id.*

The video tape reveals that after the Defendant's comments about a lawyer, Officer Stagg continued to talk to the Defendant about booking information and told the Defendant that he did not have to talk about his case. Questioning the Defendant regarding booking information does not violate the Defendant's invocation of his right to counsel. Louisiana Code of Criminal Procedure Article 228 required the arresting officer, Officer Stagg, to obtain booking information from the Defendant.

Officer Kennedy testified that he heard the Defendant say "no lawyer, can't talk" and admitted that when a person in custody makes comments like those made by the Defendant, the procedure is to not talk to him. However, when Officer Kennedy began to question the Defendant about an unrelated matter, he then *Mirandized* the Defendant and continued to speak to him about the unrelated matter.

Inasmuch as the Defendant asked for counsel and Officer Kennedy reapproached the Defendant regarding an unrelated matter when counsel was not present, the Defendant's statements are presumed involuntary and inadmissible although Officer Kennedy testified that the Defendant signed a waiver of rights form. Furthermore, the Defendant did not initiate the conversation at issue.

In *Dotson*, 747 So.2d 686, this court explained whether a defendant's invocation of the right to counsel was imputable to other officers involved in the case as follows:

9

In *U.S. v. Lenfesty,* 923 F.2d 1293, 1297 (8th Cir. 1991), the court stated that "[k]nowledge of a suspect's request for counsel made to one officer is imputed to all the other police officers involved in the case." Also, in *State v. West,* 408 So.2d 1114, 1121 (La.1982), our supreme court stated:

> ***A defendant deals with the police as a single entity.*** He is not required to differentiate among city, parish or state officials, ***or officers who might have been working another shift*** when his attorney instructed that he not give any statements. Once the defendant has ". . . expressed his desire to deal with the police only through counsel," *Edwards v. Arizona,* supra, at 484, 101 S.Ct. at 1885, all successive officers who deal with the defendant are held to have knowledge of this fact.

(Emphasis added.) *See also State v. Trevathan,* 414 So.2d 316 (La.1982). Later, in *State v. Arceneaux,* 425 So.2d 740 (La.1983), the Louisiana Supreme Court reasserted the essence of its holding in *West.* In *Arceneaux,* when interrogated by Officer McCann of the *Sulphur* Police Department, the defendant stated that he wanted to talk to an attorney. Questioning ceased, but later, Officer Steach of the *Calcasieu* Parish Sheriff's Office, unaware of the defendant's request for counsel, obtained an oral confession from the defendant. The defendant refused to give a written statement, saying that he wanted to talk to an attorney. Once again, questioning ceased. The court stated:

> [I]t is of no moment that Steach did not know of defendant's request for counsel. ***Good faith is not relevant*** because once the defendant has expressed his desire to deal with the police only through counsel, ***all successive officers who deal with the defendant are held to have knowledge of this fact.***

*Id.* at 744 (emphasis added). Thus, the court found the statement to Officer Steach to be inadmissible.

We read *West* and *Arceneaux* in the context of *Arizona v. Roberson,* 486 U.S. 675, 687-88, 108 S.Ct. 2093, 2101, 100 L.Ed.2d 704 (1988), where the United States Supreme Court stated:

10

Finally, we attach no significance to the fact that the officer who conducted the second interrogation did not know that respondent had made a request for counsel. In addition to the fact that **Edwards focuses** *on the state of mind of the suspect and not of the police,* custodial interrogation must be conducted pursuant to established procedures, and those **procedures in turn must enable an officer who proposes to initiate an interrogation to determine whether the suspect has previously requested counsel.** In this case respondent's request had been properly memorialized in a written report but the officer who conducted the interrogation simply failed to examine that report . . . . **The police department's failure to honor that request cannot be justified by the lack of diligence of a particular officer**.

(Emphasis added.)

*Id*. at 693.

After the Defendant spoke to Officer Kennedy, he was interrogated by Deputy Marks. The Defendant signed a waiver of rights form before being questioned by Deputy Marks. The Defendant was then brought to a holding cell where Officer Guillory initiated a "casual conversation" with the Defendant.

The video tape reveals that Officer Kennedy reapproached the Defendant regarding the unrelated offense. Furthermore, nothing in the record indicates the Defendant initiated the questioning by Deputy Marks or Officer Guillory. Based on *Dotson*, the Defendant's invocation of his right to counsel was imputed to all officers involved in the case including Deputy Marks and Officer Guillory.

Inasmuch as the Defendant invoked his right to counsel, and the fact that his invocation of the right to counsel is imputed to all other officers, the statement made by the Defendant to Officer Guillory should have been suppressed.

**Harmless Error**

"[T]he erroneous admission of a confession is a trial error which is subject to harmless error analysis. *Arizona v. Fulminante*, 499 U.S. 279, 310, 111

11

S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991)." *State v. Tart,* 93-0772 (La.2/9/96), 672 So.2d 116,129, *cert. denied*, 519 U.S. 934, 117 S.Ct. 310 (1996). Accordingly, this court must determine whether the admission at trial of the Defendant's statement, "F—k you, I'll do the same thing to you and uh--if I don't do it myself I can call someone to do it while I'm in jail," was so prejudicial to the Defendant that it constituted reversible error.

> Erroneous admission of evidence requires reversal only where there is a reasonable possibility that the evidence might have contributed to the verdict. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *State v. Gibson*, 391 So.2d 421 (La.1980). The relevant inquiry is whether the reviewing court may conclude the error was harmless beyond a reasonable doubt, *Chapman*, supra, i.e. was the guilty verdict actually rendered unattributable to the error. *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).

*State v. Casey*, 99-0023, p. 13 (La. 1/26/00), 775 So.2d 1022, 1033, *cert. denied*, 531 U.S. 840, 121 S.Ct. 104 (2000).

The Defendant was found guilty of second degree murder, a violation of La.R.S. 14:30.1, which provides as follows:

> A.    Second degree murder is the killing of a human being:
>
>    (1) When the offender has a specific intent to kill or to inflict great bodily harm; or
>
>    (2)(a) When the offender is engaged in the perpetration or attempted perpetration of . . . armed robbery, first degree robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm.

In order to convict the Defendant of second degree murder, the State had to prove the following:

> 1)    the Defendant killed Gerald Guidry and that he had the specific intent to kill or inflict great bodily harm upon Gerald Guidry; or

2) the Defendant killed Gerald Guidry and the offense occurred while the Defendant was engaged in the perpetration of some type of robbery or attempted robbery.

Brian Miller, a Navy recruiter, testified the Defendant went to his office in Opelousas on November 30, 2001 at 11:00 a.m. and left at 11:20. The Defendant was driving a burgundy Buick which was the same vehicle as that shown in State's exhibit 26. The Defendant was alone at that time. The Defendant was wearing a wind suit. The pants were black and the top was a pattern of white and black, but mostly black, and a "doo rag" on his head.

On November 30, 2001, Jimmy Stephen Richard stopped at Hollier Equipment in Opelousas at approximately 12:30 p.m. Cars Etc., Mr. Guidry's car lot, was located across the street from Hollier Equipment. The two businesses were separated by a four-lane highway with a turning lane. Mr. Richard glanced across the street and saw Mr. Guidry talking to a medium sized black male. Mr. Richard then proceeded to place a part on a piece of equipment he was hauling. He subsequently heard a loud popping noise. At that time, Mr. Richard turned toward Mr. Guidry's lot and saw a black male with a pistol in his hand shooting at Mr. Guidry. It appeared to Mr. Richard that the person firing shots at Mr. Guidry was hopping backwards. Mr. Richard testified that it would be his interpretation that Mr. Guidry was lunging forward and the shooter was jumping back. Mr. Richard testified that there were probably four or five shots fired. He lost sight of the two men for a "split moment" and after a "brief moment" he saw the black male get up and walk calmly toward his car, putting the gun in his pants. The black male got in his burgundy Buick and drove toward Eunice.

Mr. Richard then ran into Hollier Equipment and yelled for someone to call 911. He then went to the car lot accompanied by Tommy Hollier and Stephen Powell. When Mr. Richard approached Mr. Guidry, Mr. Guidry's wallet was laying

13

open on the ground. Mr. Richard observed a bullet hole in the top of Mr. Guidry's head.

Mr. Richard testified that the black male appeared to be the same size as he was, and Mr. Richard testified he was 5'10" tall and weighed one hundred sixty pounds. Mr. Richard recalled giving a written statement indicating the shooter was "very tall, very tall, a black male, dark complexion, about six feet three." Mr. Richard testified that the black male was wearing a black rag on his head. Mr. Richard could not positively identify the Defendant because he did not have the rag on his head in the lineup and Mr. Richard did not get a good look at the shooter's face.

Mr. Richard did not feel the Buick belonged to the car lot because it was parked outside the pipe railing that enclosed all cars on the lot. To Mr. Richard's knowledge, there was no one else on the lot and he did not see anyone else in the Buick.

Keith Fontenot testified that he was employed at Hollier Equipment on November 30, 2001. Mr. Fontenot was in the "porch room" on the side of the building when he heard four to six popping noises. He then heard Jimmy Richard yelling that someone had been shot. Mr. Fontenot walked to the door and saw a black male get in a maroon or burgundy colored car and drive west on Highway 190. Mr. Fontenot saw no one else in the vehicle. Mr. Fontenot testified that the black male was wearing something on his head. Mr. Fontenot did not see a weapon in the black male's hand.

State Trooper Kevin Guillory testified that on November 30, 2001 at approximately 12:15 or 12:30 p.m. he and Trooper David Anderson were in a State Police unit headed west on Highway 190. Trooper Anderson was driving at that time. As the two passed Mr. Guidry's car lot, Trooper Guillory saw a black male standing in the driveway of the lot. Trooper Guillory testified that the black male "stared right

14

at" him, that the two made eye contact, and he thought that was unusual. The black male was standing alone near a maroon Buick. Trooper Guillory described the person he saw as a "black male around age uh-early twenties, with a black hood pulled over his head." Trooper Guillory testified that the black male also made eye contact with Trooper Anderson and the two commented about this as they drove. The two dropped a motorcycle off at Trooper Guillory's residence and left to return to Troop I in Lafayette. When the two passed Mr. Guidry's lot on the return trip approximately fifteen minutes later, they saw emergency vehicles at the lot.

Trooper Guillory identified the car in State's exhibit 26 as the car he saw parked at the entrance of Mr. Guidry's lot. Trooper Guillory indicated the person in State's exhibit 28, a photograph of the Defendant, was the "subject with the same clothing that we witnessed at the parking lot." Even though the black male had a hood on, Trooper Guillory could tell the man had a small Afro. Trooper Guillory identified the Defendant in a photo lineup that occurred on December 5, 2001. No one suggested that he choose the Defendant from the lineup and Trooper Guillory had no doubt that the Defendant was the man he saw at the car lot.

Trooper David Anderson testified he was on duty on November 30, 2001. Trooper Guillory called his attention to an individual at the car lot. Trooper Anderson noticed the person had on a "dark colored like a pullover, like a sweatshirt deal with a hood on it." The person was a black male. Trooper Anderson was shown a photo lineup on December 6, 2001. State's exhibit 28, a photograph of the Defendant, was the same person he chose from the photo lineup. The car shown in State's exhibit 26 was similar to the vehicle parked at Mr. Guidry's lot. Trooper Anderson had no doubt that the Defendant was the person he saw at Mr. Guidry's lot. Trooper Anderson agreed that he described the man as a "black male, was approximately 5'9"/5'10", 150 to 165, medium build" in his statement to police.

15

Detective Rene Speyrer with the St. Landry Parish Sheriff's Office was the first officer on the scene. He arrived at 12:47 p.m. When Detective Speyrer arrived, Mr. Guidry's wallet was lying open on the ground. Detective Speyrer got a description of the suspect and the vehicle from Jimmy Richard. The description indicated the suspect was a "tall dark complected black male" driving a "maroon or burgundy mid-sized Buick automobile." Detective Speyrer also received information that the suspect had a black "doo rag" on his head. Detective Speyrer radioed the description into his office and indicated that the vehicle was headed west on Highway 190. Detective Speyrer phoned the Eunice Police Department and gave the description of the suspect and the vehicle to Ronnie Valenta.

Cliff Veillon was employed by the Eunice Police Department on November 30, 2001. On that day, Veillon was looking for a "late model Buick, 4-door, maroon in color, driven by a black male possibly wearing a stocking cap on him." The log sheet indicated that at 1:05 p.m. Veillon saw a vehicle traveling west fitting the description given. Vellion followed the vehicle until he could get backup. The vehicle made a left turn and pulled over. Vellion then got out of his vehicle with his gun drawn and ordered the driver out of the car. The driver got out of the car and asked Veillon what he wanted. Veillon then told the driver to get on the ground. The driver started turning like he was getting on the ground and then dropped his hands and began to turn away from Veillon. Veillon then observed the driver pulling a shiny object resembling a gun from his mid-section. The driver then started running southbound.

Officer Varden Guillory with the Eunice Police Department heard the radio dispatch requesting officers to look out for a burgundy Buick driven by a black male who was possibly wearing a cap or rag on his head. Officer Guillory saw the vehicle when it cut across his path and turned into the Pitre Law Firm parking lot.

16

Officer Guillory and Cliff Veillon yelled for the Defendant to get out of the car. Officer Guillory testified that the Defendant then got out of the vehicle, reached inside his pants, and pulled out a pistol. The Defendant then ran. Officer Guillory did not notice anyone else in the car. He stated the gun marked as State's exhibit 13 looked like the weapon the Defendant had in his hand.

Richard Malbrue, an employee of Ardoin Marble Works, saw a man running from Leger's store. Mr. Malbrue did not see the man pass the garage where the company trucks were parked. However, the man was running on Marble Works' property. Mr. Malbrue testified the man was young, black, and wore something on his head.

Terry Darbonne, a Marshall for the City of Eunice, was asked to go to the east end of the city on November 30, 2001 to assist in locating an individual. Darbonne stopped his vehicle in the 200 block of St. Mary Street and got out. Once he and Lieutenant Bret Faulkner crossed over a ditch, they heard a noise, and the Defendant appeared from the doorway of a house. The Defendant was dressed in black, but he did not have on a "doo rag;" he also did not have a weapon. The Defendant was handcuffed by Officer Tony Kennedy of the Eunice Police Department and read his rights by Detective Ryan Young. This occurred at approximately 1:15 p.m. to 1:20 p.m.

After the Defendant was booked, *Mirandized*, and placed in a holding cell, Officer Guillory went to see the Defendant at approximately 4:00 p.m. Officer Guillory asked the Defendant "why he wasn't feeling any remorse because of what he did, by taking the life of a person who was trying to make a living." The Defendant responded, "f__k you, I'll do the same thing to you if I get a chance or I'll call--make a phone call and have someone do it while I'm locked up." The response surprised Officer Guillory. No one else heard the Defendant's comments.

17

Patrick Hebert, the manager of Ardoin Marble Works, testified that on the Monday morning following November 30, 2001, he found a gun in one of the company trucks. Mr. Hebert looked inside the truck because the seat was "slouched over--up against the steering wheel." Mr. Hebert did not touch the gun.

Detective Craig Ortego, the officer in charge of the investigation, removed the gun from the truck at Marble Works. Detective Ortego went into the driver's side of the truck to remove the gun because he observed footprints on the passenger side of the vehicle. Detective Andrepont informed Detective Ortego that people had walked in the area where the shoe prints were found and Andrepont had checked the soles of everyone's shoes who had been in the area to see if there were any similarities to the prints. Patrick Hebert testified he was "probably" wearing tennis shoes the day he found the gun. The footprints were not those of Detective Andrepont or Patrick Hebert.

Detective Ortego also collected a stocking cap caught on a bush in Johnson's Junkyard on December 1, 2001. The cap was found in an area that was approximately a two minute walk from where the gun was found. The Defendant was with Detective Ortego when he found the cap.

Lynn Guidry testified that she was married to Gerald Lee Guidry. Mr. Guidry was a retired State Trooper and owned a car lot in Opelousas, Louisiana where he sold used cars. Ms. Guidry testified that her husband worked alone and could not go to the bank to make change so he normally took two to three one-hundred dollar bills, a couple of twenties, a couple of tens, a couple of fives, and ones with him when he went to work. Ms. Guidry did not know if her husband took money with him when he went to work on November 30, 2001, but he normally took money with him. Ms. Guidry was surprised that when her husband's wallet was found it had no money in

it. Ms. Guidry reviewed her husband's business records and found no transactions for November 30, 2001.

On the date of the offense, Deputy Marks seized $320.00 from the Defendant, including three one hundred dollar bills, one ten, one five, and five ones. Deputy Marks also seized the Defendant's shoes.

Doug Lancon of the Acadiana Crime Lab testified that he photographed and lifted prints from the left side of the magazine of the Ruger 45 automatic pistol submitted by police. Lancon testified that the bullet fragment found in Mr. Guidry's head was fired from the Ruger 45. Lancon testified that the magazine of the Ruger 45 held seven bullets and the chamber could hold one. He examined seven cartridge casings seized by Detective Ortego at the crime scene and they were all fired from the Ruger 45.

Janice Reeves with the Louisiana State Police Crime Lab testified that she examined the fingerprint lifts and photographs of the prints found on the Ruger and compared them to the Defendant's fingerprints. Ms. Reeves matched the left thumb print of the Defendant with a photo of the fingerprints found on the magazine of the gun. Ms. Reeves had no doubt that it was the Defendant's fingerprint on the magazine.

Winnie Wong with the Acadiana Crime Lab testified that there was blood on the bottom right side of the handle of the Ruger just above where the magazine is placed in the gun. Blood was also found on the left side of the gun just above the trigger guard. The blood was that of the Defendant. There was a one in forty-three billion chance that the blood found on the gun was not the Defendant's blood. There was no blood on the money seized from the Defendant.

Mark Kuroski with the Acadiana Crime Lab testified that the shoe prints found at Marble Works were made by the shoes seized from the Defendant.

19

Troopers Anderson and Guillory positively identified the Defendant as the person they saw at Mr. Guidry's car lot. "[P]ositive identification by only one witness is sufficient to support a conviction. (Citations omitted)." *State v. Neal*, 00-0674, p. 11 (La. 6/29/01), 796 So.2d 649, 658, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323 (2002).

The physical evidence, including the Defendant's fingerprints on the Ruger 45, the bullet fragment in the victim's head being fired from that gun, the Defendant's blood on the gun, and the Defendant's shoe prints in the area where the gun was found support the identification of the Defendant as the person at Gerald Guidry's car lot.

> The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, a reviewing court may impinge upon the fact finder's discretion "only to the extent necessary to guarantee the fundamental protection of due process of law." *State v. Mussall*, 523 So.2d 1305, 1310 (La.1988).

*State v. Tate*, 2001-1658, p. 6 (La. 5/20/03), 851 So.2d 921, 929.

The verdict in this case indicates the jury chose to believe the testimony of Troopers Guillory and Anderson and Brian Miller over that of the Defendant's many alibi witnesses. This credibility determination should not be second guessed by this court. Furthermore, the physical evidence strongly supports this conclusion.

### Specific Intent to Kill or Inflict Great Bodily Harm

"Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). "Specific intent may be inferred from the circumstances surrounding the offense and the conduct of

the defendant." *State v. Bishop*, 01-2548, p. 4 (La. 1/14/03), 835 So.2d 434, 437 (citations omitted).

"[S]pecific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person." *State v. Seals*, 95-0305, p. 6 (La. 11/25/96), 684 So.2d 368, 373, *cert. denied*, 520 U.S. 1199, 117 S.Ct. 1558 (1997) (citations omitted). The fact that multiple shots are fired at a victim indicates a defendant's culpable state of mind and satisfies the specific intent to kill requirement for murder. *State v. Griffin*, 618 So.2d 680, 700 (La.App. 2 Cir.), *writ denied*, 625 So.2d 1063 (La.1993).

Seven shots were fired at the used car lot on November 30, 2001. One of those struck Mr. Guidry in the head, killing him. Mr. Guidry was also shot in the hand, his ear was grazed by a bullet, and a bullet caused injuries to the left side of Mr. Guidry's face. Based on the injuries Mr. Guidry received and the number of shots fired, the jury could have inferred the Defendant had the specific intent to kill Mr. Guidry.

## CONCLUSION

The record demonstrates that Defendant invoked his right to counsel. After invocation of his right to counsel, the Defendant did not initiate conversation with the police and knowledge of the invocation of his right to counsel is imputed to all officers involved in the case. Inasmuch as the police did not honor the Defendant's invocation of his right to counsel, any statement made by the Defendant after the invocation of his right to counsel should have been suppressed. However, this error was harmless. Based on the positive identification of the Defendant, the physical evidence, and the number of shots fired, a rational trier of fact could have found the Defendant committed the offense of second degree murder; the verdict was surely

21

unattributable to the erroneous admission of the statement made to Officer Guillory.

We, therefore affirm the Defendant's conviction and sentence.

**AFFIRMED**.